AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| Brian Simon <br><br> *Plaintiff(s)* <br><br> v. <br><br> First Savings Bank of Indiana and First Savings Financial Group, Inc. <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* First Savings Bank of Indiana and First Saving Financial Group, Inc.
702 North Shore Drive, Suite 300
Jeffersonville, IN 47130

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

> Rachael Carp, Esquire
> Rubin Fortunato & Harbison PC
> 1200 Liberty Ridge Drive
> Suite 220
> Wayne, PA 19087
> rcarp@rubinfortunato.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: __407 Valley Glen Drive, Bryn Mawr Pennsylvania 19010__

Address of Defendant: __702 North Shore Drive, Suite 300, Jeffersonville, IN 47130__

Place of Accident, Incident or Transaction: __(Remote Work) 407 Valley Glen Drive, Bryn Mawr, Pennsylvania 19010__

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes [ ]  No [✔]

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes [ ]  No [✔]

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes [ ]  No [✔]

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes [ ]  No [✔]

I certify that, to my knowledge, the within case [ ] is / [●] is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __02/24/2023__   /s/ Rachael Carp  *Must sign here*   __201585__
         *Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

---

**CIVIL:** (Place a √ in one category only)

**A.** *Federal Question Cases:*
1. [ ] Indemnity Contract, Marine Contract, and All Other Contracts
2. [ ] FELA
3. [ ] Jones Act-Personal Injury
4. [ ] Antitrust
5. [ ] Patent
6. [ ] Labor-Management Relations
7. [ ] Civil Rights
8. [ ] Habeas Corpus
9. [ ] Securities Act(s) Cases
10. [ ] Social Security Review Cases
11. [ ] All other Federal Question Cases
    *(Please specify):* _____

**B.** *Diversity Jurisdiction Cases:*
1. [ ] Insurance Contract and Other Contracts
2. [ ] Airplane Personal Injury
3. [ ] Assault, Defamation
4. [ ] Marine Personal Injury
5. [ ] Motor Vehicle Personal Injury
6. [ ] Other Personal Injury *(Please specify):* _____
7. [ ] Products Liability
8. [ ] Products Liability – Asbestos
9. [✔] All other Diversity Cases
    *(Please specify):* __breach of contract/detrimental reliance/ violation of Pennsylvania Wage Payment and Collection Law, and related claims__

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __Rachael Carp__, counsel of record *or* pro se plaintiff, do hereby certify:

[✔] Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

[ ] Relief other than monetary damages is sought.

DATE: __02/24/2023__   /s/ Rachael Carp  *Sign here if applicable*   __201585__
         *Attorney-at-Law / Pro Se Plaintiff*   *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

*Civ. 609 (5/2018)*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BRIAN SIMON** | : | |
| | : | |
| Plaintiff, | : | **CIVIL ACTION NO.** |
| | : | |
| v. | : | |
| | : | |
| **FIRST SAVINGS BANK OF INDIANA AND FIRST SAVINGS FINANCIAL GROUP, INC.** | : | |
| | : | |
| | : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |

## COMPLAINT

Plaintiff, Brian Simon ("Simon"), by and through his undersigned attorneys, brings this Complaint against his former employer, First Savings Bank and First Savings Financial Group, Inc. (collectively, "FSB" or the "Bank"), for breach of contract, breach of implied contract, breach of the covenant of good faith and fair dealing, detrimental reliance/promissory estoppel, violation of the Pennsylvania Wage Payment and Collection Law, and fraud in the inducement. Simon seeks damages, costs, and attorney's fees for FSB's failure to pay him compensation and severance following FSB's termination of his employment without cause.

## PARTIES

1. Simon is a citizen of the Commonwealth of Pennsylvania and resides in this district at 407 Valley Glen Drive, Bryn Mawr, Pennsylvania 19010.

2. First Savings Bank is a citizen of the state of Indiana with bank locations across southern Indiana.

3. First Savings Financial Group, Inc. is a citizen of the state of Indiana. It is the holding company of First Savings Bank. First Savings Financial Group, Inc. is a publicly traded

company and its common stock is listed on NASDAQ under the symbol FSFG.

## JURISDICTION AND VENUE

4. The court has diversity jurisdiction over this case pursuant to 23 U.S.C. §1332(a) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.

5. The court has jurisdiction over FSB because it has a nationwide mortgage business and writes or funds mortgages within the Commonwealth of Pennsylvania.

6. Venue in this district is proper pursuant to 28 U.S.C. §1391(b) as Simon resides and worked remotely for FSB in this judicial district, and many of the events giving rise to this action occurred in this judicial district.

## FACTUAL BACKGROUND

7. In January 2021, FSB recruited Simon to become a Senior Vice President, an Officer of the Bank, and the Director of its Mortgage Banking Group.

8. When FSB's executive search firm, Affinity Five Search Group, contacted Simon about the position, he was not actively looking for a new job. At the time, Simon was the President of multiple mortgage origination businesses for Altisource Portfolio Solutions S.A, a service provider and mortgage cooperative for the real estate and mortgage industries.

9. At Altisource, Simon was a high-earning executive and was compensated via an annual salary, bonus, and stock options.

10. Simon was hesitant to join a bank because, in his experience, banks are notoriously skittish concerning the mortgage industry and have a history of slimming down or exiting their mortgage businesses when interest rates are volatile. *See, e.g.,* Wells Fargo and First Internet Bancorp.

11. Simon told Larry Myers, FSB's Chief Executive Officer, and Tony Schoen, FSB's Chief Financial Officer, that he would not accept a position with FSB unless they provided him with downside protection in the event that FSB trimmed or exited the mortgage business.

12. Specifically, Simon told Myers and Schoen that he required advance notice of termination and a year of salary as severance if FSB terminated his employment without cause.

13. Myers and Schoen did not balk at Simon's conditions. Rather, they agreed without hesitation that FSB would provide Simon with 30 days' notice and would pay him a year of salary as severance if FSB terminated his employment without cause.

14. Simon would not have accepted employment with FSB without the guarantee of a year's salary as severance. In fact, his severance agreement is common in the industry for executives at Simon's level.

15. With the issue of severance resolved, Schoen provided Simon with an Offer Letter on February 11, 2021, attached hereto as Exhibit "A."

16. The Offer Letter set forth the basic terms of FSB's offer of employment, including Simon's initial base salary: $350,000, and commission payout: 5% of the net pretax income for the Mortgage Banking Division. See id.

17. The Offer Letter also stated: "You will be provide (*sic*) the opportunity to enter into a one-year employment agreement with the Bank that is mutually agreeable to both parties and which shall include customary conditions for voluntary (for and without Good Reason) and involuntary (for and without Cause) termination and restrictive covenants relating to competition and solicitations post-employment." Id.

18. On February 11, 2021, Schoen emailed the Offer Letter to Simon; Myers; Tony

Caico, the executive recruiter who placed Simon with FSB; Dawn Black, FSB's Human Resources Manager; and Lisa Morely, another FSB employee. Schoen's cover email stated: "Attached is the finalized and executed offer letter that *includes the commitment to a one-year employment contract*, which is to be substantially similar to those currently between the Bank and various executive officers." See February 11, 2021 cover email attached hereto as Exhibit "B." Emphasis added.

19. Three things are clear from the terms of the Offer Letter and Schoen's February email: (1) the Offer Letter contained some, but not all, of the negotiated and agreed-upon terms of Simon's employment with FSB; (2) the Bank *committed* to Simon that it would enter into an employment contract with him; and (3) the employment contract would include conditions for voluntary and involuntary termination.

20. On February 16, 2021, Simon signed the Offer Letter and contacted Black concerning the promised employment agreement and whether he would receive the proposed agreement before his start date.

21. On February 17, 2021, Black responded to Simon's query and stated: "Unfortunately, you will not receive these until the week you start. Per Tony, the draft agreement and comp plan will go to the Bank's Compensation Committee next week, so he will provide and review these with you the week you start." See February 17, 2021 email attached hereto as Exhibit "C."

22. Simon was disappointed that he would not be able to review and sign the employment agreement prior to his start date; however, based on FSB's representations, he had every expectation that the agreement would contain all of the material terms of his employment and that it would be executed shortly after he started with FSB.

23. Relying upon FSB's promises concerning the terms of his employment, including the payment of severance, Simon resigned from Altisource and, on March 1, 2021, he joined FSB as an Officer of the Bank and its Mortgage Banking Director.

24. Shortly thereafter, Schoen provided Simon with a draft Employment Agreement ("initial draft"), a copy of which is attached hereto as Exhibit "D." The initial draft included three sections concerning the payment of severance: 4.1, 5.1, and 8.7.

25. Section 4.1, entitled: "Cash Severance after Termination Without Cause or Termination for Good Reason" provided that "if the Officer's employment terminates involuntarily but without Cause or if the Officer voluntarily terminates employment with Good Reason, the Officer shall receive from the Bank the Base Salary for the remaining term of the Agreement, with the amount paid in a single lump sum within ten (10) calendar days of termination…." See id. at §4.1.

26. Section 5.1, entitled: "Change in Control Benefits" provided that "[i]f a Change in Control occurs during the term of this Agreement and, thereafter during the term of the Agreement, the Officer's employment terminates involuntarily but without Cause or if the Officer voluntarily terminates employment with Good Reason, the Bank shall make or cause to be made a single lump-sum payment to the Officer in an amount in cash equal to one (1) times the Officer's base Salary…The payment required under this paragraph is payable no later than five (5) business days after the Officer's termination." Id. at §5.1.

27. Section 8.7, entitled "No Duty to Mitigate" provided that "[t]he Officer shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment. Moreover, provided that the Officer is not in breach of any obligation under Articles 6 and 7 of this Agreement, the amount of any payment provided for in this Agreement

5

shall not be reduced by any compensation earned or benefits provided as the result of employment of the Officer or as a result of the Officer being self-employed after employment termination." Id. at §8.7.

28. Upon receipt of the initial draft, including the conflicting terms regarding the payment of severance, Simon contacted Schoen and requested that Section 4.1 be revised to mirror the language of Section 5.1 and the oral agreement that FSB would pay Simon severance equal to his base salary, with no reduction.

29. Without hesitation, Schoen agreed to revise Section 4.1 to mirror the language of Section 5.1 and the oral agreement that FSB would pay Simon severance equal to his base salary, with no reduction.

30. On April 30, 2021, Schoen sent Simon an email titled "Employment Agreement – Final" in which he stated:

> Hey BS,
> I've made the revision you suggested in Section 4.1, as follows, which excludes the previous limitation of the amount to remaining term of the agreement. No other revisions were made.
>
> **4.1 Cash Severance after Termination Without Cause or Termination for Good Reason.** Subject to Section 8.9 of this Agreement, if the Officer's employment terminated involuntarily but without cause or if the Officer voluntarily terminates employment with Good Reason, the Officer shall receive from the Bank the Base Salary, with the amount paid in a single lump sum within ten (10) calendar days of termination....

See April 30, 2021 email and second draft of Agreement ("second draft") attached hereto as Exhibit "E." Highlighting in the original.

31. After this exchange, Simon and Schoen discussed a few additional, non-substantive modifications to the second draft. Schoen repeatedly promised to provide an updated draft Agreement to Simon, but never did so.

6

32. Over the next several months, Simon followed up multiple times with both Schoen and Julie Bleich, FSB's Human Resources Director, concerning the status of the Agreement, to no avail.

33. In fact, as late as October 2021, Simon was still communicating with Schoen and Bleich concerning the status of an updated Agreement. Bleich apologized for the delay and promised that she would have an execution copy for him shortly. She indicated that outside counsel was reviewing all FSB Agreements, including his Agreement. Bleich stated that counsel was reviewing his draft Agreement, "not to make any material changes, but to ensure that the language is clear and concise…"

34. Bleich thanked Simon for his patience, stating, "I see the light at the end of the tunnel!"

35. FSB never provided Simon with a final Agreement.

36. At this point, months into his employment, Simon felt stuck. He had left Altisource, relying upon the terms he had negotiated with Myers and Schoen and the promise of a written Agreement memorializing the parties' oral contract.

37. Simon was uncomfortable with the lack of an executed Agreement; however, FSB was paying him pursuant to the agreed-upon terms and he was executing his duties at a high level and pursuant to the agreed-upon terms. As such, Simon believed that both he and FSB were operating pursuant to, and intended to adhere to, the terms they had negotiated.

38. Interest rates turned volatile in 2022, and FSB, as predicted, turned skittish. On January 17, 2023, FSB terminated Simon's employment without Cause and without notice as part of its decision to shrink its mortgage business. While the parties had agreed that FSB would provide Simon with 30 days' notice prior to termination (see §3.4 of Exhibit "E"), Simon's

7

termination was effective immediately.

39. Equally wrongful, FSB reneged on its promise of severance. Instead of paying Simon $350,000 within ten (10) days of his termination as negotiated and agreed, FSB offered to pay him $10,769.23 in exchange for his execution of a release of claims.

40. FSB's termination letter to Simon stated:

> As you know, First Savings Bank has been in the process of reducing its workforce as a result of sustained financial losses within the Mortgage Banking division. Due to decreased loan production, loss of employees, and for financial and other economic reasons, the decision has been made to eliminate your position, effective 1/17/2023….
>
> To assist you with your transition to new employment, and in exchange for signing and returning this agreement, you will receive separation pay of $10,769.23, which is equal to two weeks of base salary…

See January 17, 2023 termination letter attached hereto as Exhibit "F."

41. Simon was shocked. He had negotiated severance equal to a year of salary for this exact situation: FSB's decision to trim its mortgage business after a period of volatility. He had relied upon FSB's agreement to pay severance and left a secure job with Altisource. Yet, FSB had failed to provide him with the requisite 30 days' notice and refused to pay him the agreed-upon $350,000.

42. Even more insulting, when Simon discussed FSB's $10,769 offer with Schoen, Schoen told him that Myers knew he would not accept the offer and expected him to negotiate.

43. Simon responded that he and FSB had already negotiated severance prior to the commencement of his employment to which Schoen indicated that he was aware an Agreement was "out there."

44. Bleich also told him that FSB was taking the position that, because the Agreement had never been executed, the Bank was not required to pay him the agreed-upon severance.

45. In other words, FSB had decided to take advantage of its own delay in providing

8

Simon with a final copy of the Agreement and its superior bargaining position to avoid its contractual obligation to pay him $350,000 upon his termination without Cause.

46. By terminating his employment without notice, FSB also failed to pay Simon the 30 days' of wages that he would have received during the notice period.

47. Also by terminating his employment without notice, FSB was able to exploit a provision in the Employee Handbook providing that employees will forfeit 100% of their accrued vacation time if their employment with the Bank terminates before February 1. Had FSB provided Simon with the requisite 30 days' notice, his employment would have terminated on February 17, 2023 and he would have been entitled to at least 25% of his accrued but unused vacation time. Simon may also have been entitled to additional accrued, but unused, sick leave.

48. As a direct and proximate result of FSB's deliberate, unlawful, and malicious actions, Simon has sustained significant and continuing economic loss in excess of $450,000, including but not limited to, loss of income and benefits, loss of severance, and lost earning potential.

## COUNT I – BREACH OF CONTRACT

49. The allegations in the preceding paragraphs are incorporated herein by reference as though set forth in full.

50. Prior to commencing employment with FSB, Simon and FSB negotiated the terms of Simon's employment, including the requirement that FSB provide him with 30 days' notice prior to terminating his employment without Cause and the payment of a year of salary as severance. There was a meeting of the minds as to these terms.

51. The terms of the Simon's employment contract were codified in emails between Schoen and Simon and memorialized in a written employment Agreement; however, the

9

Agreement was never executed because FSB repeatedly delayed providing a final copy of same to Simon.

52. Although the Agreement was not executed, a contract exists between FSB and Simon.

53. The parties acted in accordance with the terms of the Agreement for nearly two years.

54. Simon fulfilled his duties in accordance with the terms of the Agreement and FSB paid him accordingly.

55. FSB breached the parties' contract when it terminated Simon's employment without notice and refused to pay him the agreed-upon severance of $350,000.

56. FSB breached the parties' contract when it terminated Simon's employment without notice and failed to pay Simon the 30 days' of salary that he would have received during the notice period.

57. FSB also failed to pay him the accrued vacation and sick leave time to which he would have been entitled if FSB had provided the requisite notice.

58. As a direct and proximate result of FSB's actions, Simon has sustained significant and continuing economic loss in excess of $450,000, including but not limited to, loss of income and benefits, loss of severance, and lost earning potential.

## COUNT II – BREACH OF IMPLIED CONTRACT

59. The allegations in paragraphs 1 through 48 are incorporated herein by reference as though set forth in full.

60. Prior to commencing employment with FSB, Simon and FSB negotiated the terms of Simon's employment, including the requirement that FSB provide him with 30 days' notice

10

prior to terminating his employment without Cause and the payment of a year of salary as severance.

61. These discussions were codified in emails between Schoen and Simon and memorialized in a written employment Agreement; however, the Agreement was never executed because FSB repeatedly delayed providing a final copy of same to Simon.

62. Although the Agreement was not executed, an implied in fact contract exists between FSB and Simon concerning 30 days' notice of termination and the payment of $350,000 in severance.

63. The parties acted in accordance with the terms of the Agreement for nearly two years.

64. Simon fulfilled his duties in accordance with the terms of the Agreement and FSB paid him accordingly.

65. An implied in fact contract exists if a reasonable person would understand from the parties' words and deeds that the parties intended to enter into a contract.

66. Simon and FSB entered into an implied in fact contract, which FSB breached when it terminated Simon's employment without notice and refused to pay him the agreed-upon severance of $350,000.

67. By terminating his employment without notice, FSB also failed to pay Simon the 30 days' of salary that he would have received during the notice period.

68. FSB also failed to pay him the accrued vacation and sick leave time to which he would have been entitled if FSB had provided the requisite notice.

69. As a direct and proximate result of FSB's actions, Simon has sustained significant and continuing economic loss in excess of $450,000, including but not limited to, loss of income and benefits, loss of severance, and lost earning potential.

## COUNT III –
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

70. The allegations in paragraphs 1 through 48 are incorporated herein by reference as though set forth in full.

71. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." RESTATEMENT (SECOND) OF CONTRACTS § 205.

72. Simon reasonably expected, based upon the parties' negotiations and the express terms of the written employment Agreement, that FSB would provide him with 30 days' notice and pay him $350,000 in severance if it terminated his employment without Cause. FSB acted unreasonably and in bad faith when it failed to do either.

73. FSB also failed to pay him the wages and accrued vacation and sick leave time to which he would have been entitled if FSB had provided the requisite notice.

74. As a direct and proximate result of FSB's actions, Simon has sustained significant and continuing economic loss in excess of $450,000, including but not limited to, loss of income and benefits, loss of severance, and lost earning potential.

## COUNT IV – DETRIMENTAL RELIANCE/PROMISSORY ESTOPPEL

75. The allegations in paragraphs 1 through 48 are incorporated herein by reference as though set forth in full.

76. FSB promised Simon that he would be entitled to 30 days' notice and one year's salary as severance in the event it terminated his employment without Cause.

12

77. FSB knew or reasonably expected that this promise would induce Simon to terminate his employment with Altisource and join FSB.

78. Simon relied on FSB's assurances concerning notice termination and the payment of severance to his detriment.

79. This belief was reasonable in light of the written and oral communications surrounding Simon's negotiation of employment and the terms of severance, in particular. See Exhibits D-F.

80. But for FSB's promise to pay Simon a year of salary as severance, he would not have left his position with Altisource to work for FSB because, in Simon's experience, banks are notoriously skittish about the mortgage industry and Simon was concerned that FSB might decide to trim or exit the business. As such, the guarantee of severance was a material component of his decision to accept employment with FSB.

81. However, on January 17, 2023, FSB terminated Simon's employment without Cause and without the requisite 30 days' notice.

82. FSB then refused to pay him the agreed upon severance of $350,000.

83. It also failed to pay him the wages and accrued vacation and sick leave time to which he would have been entitled if FSB had provided the requisite notice.

84. Injustice can only be avoided by enforcing FSB's promise.

85. As a direct and proximate result of FSB's actions, Simon has sustained serious and continuing economic loss in excess of $450,000, including but not limited to, loss of income and benefits, loss of severance, and lost earning potential.

## COUNT V – VIOLATION OF THE PENNSYLVANIA WAGE PAYMENT AND COLLECTION LAW (43 Pa. Stat. Ann. §260.1 et seq.)

86. The allegations set forth in paragraphs 1 through 48 are incorporated herein by reference as though set forth in full.

87. FSB has violated Pennsylvania's Wage Payment and Collection Law, 43 Pa. Stat. Ann. §260.1 et seq., ("WPCL") by failing to pay Simon wages to which he is entitled.

88. The WPCL provides in pertinent part:

(a) Wages other than fringe benefits and wage supplements. Every employer shall pay all wages, other than fringe benefits and wage supplements, due to his employees on regular paydays designated in advance by the employer. Overtime wages may be considered as wages earned and payable in the next succeeding pay period. All wages, other than fringe benefits and wage supplements, earned in any pay period shall be due and payable within the number of days after the expiration of said pay period as provided in a written contract of employment or, if not so specified, within the standard time lapse customary in the trade or within 15 days from the end of such pay period. The wages shall be paid in lawful money of the United States or check, except that deductions provided by law, or as authorized by regulation of the Department of Labor and Industry for the convenience of the employee, may be made including deductions of contributions to employee benefit plans which are subject to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

(b) Fringe benefits and wage supplements. Every employer who by agreement deducts union dues from employees' pay or agrees to pay or provide fringe benefits or wage supplements, must remit the deductions or pay or provide the fringe benefits or wage supplements, as required, within 10 days after such payments are required to be made to the union in case of dues or to a trust or pooled fund, or within 10 days after such payments are required to be made directly to the employee, or within 60 days of the date when proper claim was filed by the employee in situations where no required time for payment is specified.

43 P.S. § 260.3

89. The WPCL defines wages as follows:

"WAGES." Includes all earnings of an employee, regardless of whether determined on time, task, piece, commission or other method of calculation. The term "wages" also includes fringe benefits or wage supplements whether payable by the employer from his funds or from amounts withheld from the employees' pay by the employer.

43 P.S. § 260.2a.

14

90. The WPCL defines fringe benefits or wage supplements as follows:

> "FRINGE BENEFITS OR WAGE SUPPLEMENTS." Includes all monetary employer payments to provide benefits under any employee benefit plan, as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.; as well as separation, vacation, holiday, or guaranteed pay; reimbursement for expenses; union dues withheld from the employees' pay by the employer; and any other amount to be paid pursuant to an agreement to the employee, a third party or fund for the benefit of employees.

Id.

91. FSB was obligated to provide Simon with 30 days' notice of his termination without Cause. By terminating his employment without notice, FSB avoided paying Simon 30 days' of wages to which he was entitled.

92. FSB was obligated to pay Simon a year of salary as severance if it terminated his employment without Cause. By refusing to do so, FSB avoided paying Simon $350,000 to which he is entitled.

93. Also by terminating Simon's employment without notice, FSB was able to exploit a provision in the Employee Handbook providing that employees will forfeit 100% of their accrued vacation time if their employment with the Bank terminates before February 1. Had FSB provided Simon with the requisite 30 days' notice, his employment would have terminated on February 17, 2023, and he would have been entitled to at least 25% of his accrued but unused vacation time. Simon may also have been entitled to additional accrued, but unused, sick leave.

94. FSB has failed to pay Simon more than $450,000 in wages, fringe benefits, and wage supplements.

95. Pursuant to the WPCL, Simon is entitled to recover his unpaid wages plus liquidated damages in an amount equal to twenty-five percent (25%) of the total amount of wages due. See 43 P.S. § 260.10.

15

96. Pursuant to the WPCL, Simon is also entitled to recover his costs and attorney's fees of any nature from FSB. See 43 P.S. § 260.9a.

## COUNT VI – FRAUD IN THE INDUCEMENT

97. The allegations set forth in paragraphs 1 through 48 are incorporated herein by reference as if set forth in full.

98. Pennsylvania law recognizes a claim of fraud in the inducement to accept employment. Martin v. Hale Prods., 699 A.2d 1283, 1287 (Pa. Super. 1996).

99. FSB fraudulently induced Simon to leave his position with Altisource and join FSB by promising, among other things, to provide him with 30 days' notice of termination and a year of salary as severance if it terminated his employment without Cause.

100. FSB's representations concerning severance were material to Simon. He would not have joined FSB without its guarantee of downside protection because, in his experience, banks are notoriously skittish about the mortgage business, and he was concerned that FSB might decide to trim or close its mortgage business if the market took a downturn.

101. FSB made these misrepresentations to Simon knowingly or with reckless disregard as to their truth or falsity.

102. FSB's statements were calculated to deceive.

103. FSB intended Simon to rely on its representations, and Simon reasonably relied on them to his detriment.

104. In so acting, FSB committed fraud and is liable to Simon for his continuing economic loss in excess of $450,000, including but not limited to, loss of income and benefits, loss of severance, and lost earning potential.

**WHEREFORE**, as a result of FSB's unlawful and inequitable conduct, Simon respectfully requests that this Court enter judgment in his favor and against FSB and grant the maximum relief allowed by law, including, but not limited to:

A. Severance, in an amount to be determined at trial, but not less $350,000;

B. 30 days of wages in an amount to be determined at trial, but not less than $30,000;

C. Accrued but unpaid vacation and sick time;

D. Attorney's fees and costs;

E. Punitive, compensatory, and/or exemplary damages in an amount to be determined at trial, but sufficient to punish FSB for its intentional, negligent, willful, wanton, and/or malicious conduct;

F. Pre-judgement interest in an appropriate amount; and

G. Such other and further relief as is just and equitable under the circumstances.

## JURY DEMAND

Simon herby demands a trial by jury as to all issues so triable.

Respectfully submitted,

Dated: February 24, 2023       By: */s/ Rachael Luken Carp*
Rachael Luken Carp, Esquire (PA Bar No. 201585)
Melanie E. Osborn, Esquire (PA Bar No. 320891)
Rubin, Fortunato & Harbison P.C.
1200 Liberty Ridge Drive, Suite 220
Wayne, PA 19087
T: 610-408-2005/2010/2028
F: 610-854-4305/4329/1862
rcarp@rubinfortunato.com
mosborn@rubinfortunato.com
*Attorneys for Plaintiff, Brian Simon*

17