# Exhibit "A"



February 11, 2021

Brian Simon
407 Valley Glen Drive
Bryn Mawr, Pennsylvania 19010

Re:  Offer of Employment with First Savings Bank (Jeffersonville, Indiana)

Dear Brian,

We are pleased to offer you a position of employment with First Savings Bank (the "Bank").  We believe that you will be a valuable asset to our team as we continue to enhance the mortgage banking capabilities of the Bank.  We also believe that the Bank, given its financial strength, capital resources, liquidity and dynamic culture, will be a great home for you and your expertise.

The position offered is Senior Vice President, Mortgage Banking Director with a projected start date of no later than March 8, 2021.  The initial annual base salary will be $350,000; paid every two weeks.  All officer reviews, including any salary adjustments, are completed on an annual basis with an effective date of March 1st.

You will be provide the opportunity to enter into a one-year employment agreement with the Bank that is mutually agreeable to both parties and which shall include customary conditions for voluntary (for and without Good Reason) and involuntary (for and without Cause) termination and restrictive covenants relating to competition and solicitations post-employment.

You will participate in a Mortgage Banking Director Compensation Plan (the "Compensation Plan") that is yet to be drafted, but shall begin upon commencement of your employment and under which you shall receive five percent (5%) of the net pretax income for the Mortgage Banking Division of the Bank, made payable on a monthly basis.  Due to your participation in the Compensation Plan, you will not participate in the Bank's nonqualified Management Incentive Bonus (the "MIB") and All-Employee Bonus (the "AEB") plans.

As a Senior Vice President, you will be provided four weeks of pro-rated vacation in calendar 2021, resulting in seventeen day for use during the remainder of calendar 2021, and four weeks each calendar year thereafter. You will be eligible to participate in the Bank-sponsored health insurance plan along with its generous sharing of premiums and provided Bank-paid dental and vision insurance for the employee only.  The Bank also provides Bank-paid life, disability, supplemental cancer, and supplemental critical care and recovery insurance for all officers.  You will be afforded the opportunity to participate in the Bank's 401(k) plan once you meet the eligibility requirement, which includes auto-enrollment for employee contributions after ninety days of service and Bank matching contributions commencing after one year of service.

Reasonable business-related expenses incurred for the purpose of promoting and effectuating the Bank's business objectives will be eligible for reimbursement and such reimbursement will occur subject to receipt of documentary evidence. Reimbursable business-related expenses include, but are not limited to, professional dues, continuing professional education, seminars and training, travel and overnight lodging charges, limited meals and entertainment expense, mileage related to business use of personal vehicles, office supplies, and miscellaneous fees and charges for items such as parking, copying, postage, and courier delivery. You will be afforded the opportunity to join the Bank's corporate cellular plan with Verizon or may choose to receive a monthly allowance $55.00 for business-related use of your personal cellular plan.

As a Senior Vice President, you will report directly to the Executive Vice President, Chief Financial Officer. You will also be a member of the Mortgage Banking Compliance and Governance Committee.

You may contact Dawn Black, Human Resources Manager, at 812-218-6802 or dblack@fsbbank.net in order to discuss and review the benefits available to you and/or to address any employment-related questions you may have. You may also contact Larry W. Myers, President and Chief Executive Officer, at 812-218-6800 or lmyers@fsbbank.net with any questions regarding specific details of the position offered.

This offer is subject to the Bank's satisfactory completion of background, credit, reference and other reviews, where applicable.

By executing this letter, you declare that you are not inhibited or precluded from employment by the Bank other than that previously disclosed and have provided all relevant documents pertaining to current and former employment obligations.

If you choose to accept this offer, please sign this letter in the space provided below and return it to Mrs. Black, which can be done electronically to the email address provided above. This offer is valid until 5:00 pm EST on Friday, February 12, 2021.

We look forward to welcoming you as an officer of First Savings Bank.


Sincerely,                                          Countersigned:



Tony A. Schoen                                      Date:
EVP, Chief Financial Officer
First Savings Bank

*on behalf of:*

Larry W. Myers
President and CEO
First Savings Bank

# Exhibit "B"

From: **Tony A. Schoen, CPA** <tschoen@fsbbank.net>
Date: Thu, Feb 11, 2021 at 7:49 PM
Subject: RE: Brian Simon Final Offer Letter - Confidential
To: Brian Simon <basimon407@gmail.com>
Cc: Tony <tony.caico@affinityfive.com>, Larry Myers <lmyers@fsbbank.net>, Lisa Morley
<LMorley@fsbbank.net>, Dawn Black <DBlack@fsbbank.net>

Good evening Brian,

Attached is the finalized and executed offer letter that includes the commitment to a one-year employment
contract, which is to be substantially similar to those currently between the Bank and various executive
officers.  Please execute the attached and returned the scanned countersigned copy via email to Dawn Black,
referenced in the letter and copied hereto.

Have a great evening,

Tony

---

**From:** Tony A. Schoen, CPA
**Sent:** Wednesday, February 10, 2021 4:34 PM
**To:** 'Brian Simon' <basimon407@gmail.com>
**Cc:** 'Tony' <tony.caico@affinityfive.com>; Larry Myers (lmyers@fsbbank.net) <lmyers@fsbbank.net>
**Subject:** Brian Simon Draft Offer Letter - Confidential

Brian,

Attached, please find the draft offer letter for your review, which is confidential in nature.  Once you've had an
opportunity to review the attached offer, please contact me in order to discuss it.

We look forward to welcoming you as the Senior Vice President, Mortgage Banking Director of First Savings Bank in early March 2021.


Sincerely,

Tony




**Tony A. Schoen, CPA**
Chief Financial Officer
First Savings Bank | www.fsbbank.net
702 North Shore Drive, Suite 300 | Jeffersonville, IN 47130
tschoen@fsbbank.net | 812.218.6807 direct | 812.670.3735 fax

   


*This transmission cannot be guaranteed to be secure or error free as information could be intercepted, corrupted, lost, destroyed, or contain viruses. The sender, therefore, does not accept liability for any errors or omissions in the contents of this message, which arise as a result of this transmission. The information in this email is confidential, may be privileged, and is intended solely for the use of the person addressed. Access to this email by anyone else is unauthorized. If you are not the intended recipient or a person authorized to deliver it to the named addressee, do not read, copy, retain, or disseminate this message or any attachment. If you have received this message in error, please notify the sender by return e-mail and delete this message and any attachments from your system.*


--
Brian A. Simon
(215) 779-0979
basimon407@gmail.com



February 11, 2021

Brian Simon
407 Valley Glen Drive
Bryn Mawr, Pennsylvania 19010

Re:  Offer of Employment with First Savings Bank (Jeffersonville, Indiana)

Dear Brian,

We are pleased to offer you a position of employment with First Savings Bank (the "Bank").  We believe that you will be a valuable asset to our team as we continue to enhance the mortgage banking capabilities of the Bank.  We also believe that the Bank, given its financial strength, capital resources, liquidity and dynamic culture, will be a great home for you and your expertise.

The position offered is Senior Vice President, Mortgage Banking Director with a projected start date of no later than March 8, 2021.  The initial annual base salary will be $350,000; paid every two weeks.  All officer reviews, including any salary adjustments, are completed on an annual basis with an effective date of March 1st.

You will be provide the opportunity to enter into a one-year employment agreement with the Bank that is mutually agreeable to both parties and which shall include customary conditions for voluntary (for and without Good Reason) and involuntary (for and without Cause) termination and restrictive covenants relating to competition and solicitations post-employment.

You will participate in a Mortgage Banking Director Compensation Plan (the "Compensation Plan") that is yet to be drafted, but shall begin upon commencement of your employment and under which you shall receive five percent (5%) of the net pretax income for the Mortgage Banking Division of the Bank, made payable on a monthly basis.  Due to your participation in the Compensation Plan, you will not participate in the Bank's nonqualified Management Incentive Bonus (the "MIB") and All-Employee Bonus (the "AEB") plans.

As a Senior Vice President, you will be provided four weeks of pro-rated vacation in calendar 2021, resulting in seventeen day for use during the remainder of calendar 2021, and four weeks each calendar year thereafter. You will be eligible to participate in the Bank-sponsored health insurance plan along with its generous sharing of premiums and provided Bank-paid dental and vision insurance for the employee only.  The Bank also provides Bank-paid life, disability, supplemental cancer, and supplemental critical care and recovery insurance for all officers.  You will be afforded the opportunity to participate in the Bank's 401(k) plan once you meet the eligibility requirement, which includes auto-enrollment for employee contributions after ninety days of service and Bank matching contributions commencing after one year of service.

Reasonable business-related expenses incurred for the purpose of promoting and effectuating the Bank's business objectives will be eligible for reimbursement and such reimbursement will occur subject to receipt of documentary evidence. Reimbursable business-related expenses include, but are not limited to, professional dues, continuing professional education, seminars and training, travel and overnight lodging charges, limited meals and entertainment expense, mileage related to business use of personal vehicles, office supplies, and miscellaneous fees and charges for items such as parking, copying, postage, and courier delivery. You will be afforded the opportunity to join the Bank's corporate cellular plan with Verizon or may choose to receive a monthly allowance $55.00 for business-related use of your personal cellular plan.

As a Senior Vice President, you will report directly to the Executive Vice President, Chief Financial Officer. You will also be a member of the Mortgage Banking Compliance and Governance Committee.

You may contact Dawn Black, Human Resources Manager, at 812-218-6802 or dblack@fsbbank.net in order to discuss and review the benefits available to you and/or to address any employment-related questions you may have. You may also contact Larry W. Myers, President and Chief Executive Officer, at 812-218-6800 or lmyers@fsbbank.net with any questions regarding specific details of the position offered.

This offer is subject to the Bank's satisfactory completion of background, credit, reference and other reviews, where applicable.

By executing this letter, you declare that you are not inhibited or precluded from employment by the Bank other than that previously disclosed and have provided all relevant documents pertaining to current and former employment obligations.

If you choose to accept this offer, please sign this letter in the space provided below and return it to Mrs. Black, which can be done electronically to the email address provided above. This offer is valid until 5:00 pm EST on Friday, February 12, 2021.

We look forward to welcoming you as an officer of First Savings Bank.


Sincerely,                                                    Countersigned:



Tony A. Schoen                                               Date:
EVP, Chief Financial Officer
First Savings Bank

*on behalf of:*

Larry W. Myers
President and CEO
First Savings Bank

# Exhibit "C"

From: **Dawn Black** <DBlack@fsbbank.net>
Date: Wed, Feb 17, 2021 at 8:55 AM
Subject: RE: Signed offer letter
To: Brian Simon <basimon407@gmail.com>


Hi Brian,

Unfortunately, you will not receive these until the week you start.  Per Tony, the draft agreement and comp plan will go to the Bank's Compensation Committee next week, so he will provide and review these with you the week you start.


Thanks.

Dawn





**Dawn Black**
Vice President - Human Resources Manager
First Savings Bank | www.fsbbank.net
702 North Shore Drive, Suite 300 | Jeffersonville, IN   47130

DBlack@fsbbank.net | 812.283.0724 | 812.670.3734 fax

   

Click Here to Send Me a Secure File

*This transmission cannot be guaranteed to be secure or error free as information could be intercepted, corrupted, lost, destroyed, or contain viruses. The sender, therefore, does not accept liability for any errors or omissions in the contents of this message, which arise as a result of this transmission. The information in this email is confidential, may be privileged, and is intended solely for the use of the person addressed. Access to this email by anyone else is unauthorized. If you are not the intended recipient or a person authorized to deliver it to the named addressee, do not read, copy, retain, or disseminate this message or any attachment. If you have received this message in error, please notify the sender by return e-mail and delete this message and any attachments from your system.*

**From:** Brian Simon <basimon407@gmail.com>
**Sent:** Tuesday, February 16, 2021 7:53 PM
**To:** Dawn Black <DBlack@fsbbank.net>
**Subject:** Re: Signed offer letter

Dawn,

I signed everything this afternoon.

One question- my offer includes a variable comp piece as well as references an employment agreement. Will I see those before my start date?

Thanks!

Brian

# Exhibit "D"

**EMPLOYMENT AGREEMENT**

This **EMPLOYMENT AGREEMENT** (the "Agreement") is entered into effective as of March 1, 2021 (the "Effective Date"), by and between **BRIAN A. SIMON** (the "Officer") and **FIRST SAVINGS BANK** (the "Bank"), a state-chartered commercial bank and wholly-owned subsidiary of **FIRST SAVINGS FINANCIAL GROUP, INC.** (the "Corporation").

**WHEREAS,** the Officer serves in a position of substantial responsibility with the Bank;

**WHEREAS,** the Bank wishes to set forth the terms of the Officer's continued employment in this position; and

**WHEREAS,** the Officer is willing and desires to continue to serve in this position with the Bank.

**NOW THEREFORE,** in consideration of these premises, the mutual covenants contained herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows.

**ARTICLE 1**
**EMPLOYMENT**

 **1.1** __Employment.__ The Bank hereby employs the Officer to serve as Senior Vice President and Mortgage Banking Director of the Bank according to the terms and conditions of this Agreement and for the period stated in Section 1.4 of this Agreement.  The Officer hereby accepts employment according to the terms and conditions of this Agreement and for the period stated in Section 1.4 of this Agreement.

 **1.2** __Duties.__ As Senior Vice President and Mortgage Banking Director of the Bank, the Officer shall serve as the chief officer of the Bank's Mortgage Banking business segment (the "Mortgage Banking Division" or the "Division").  For purposes of this Agreement, "Mortgage Banking Business" means the business of prospecting, originating, closing, funding, hedging, selling and settling residential mortgage loans.  The Officer shall report directly to an executive vice president of the Bank.  The Officer shall serve the Bank faithfully, diligently, competently, and to the best of the Officer's ability.

The Officer shall exclusively devote full working time, energy, and attention to the business of the Bank and to the promotion of the interests of the Bank throughout the term of this Agreement.  Without the prior written consent of the Board, during the term of this Agreement, the Officer shall not render services to or for any person, firm, corporation, or other entity or organization in exchange for compensation, regardless of the form in which the compensation is paid and regardless of whether it is paid directly or indirectly to the Officer.  Nothing in this Section 1.2 shall prevent the Officer from managing personal investments and affairs, serving on civic boards or performing volunteer services, provided that doing so does not interfere with the proper performance of the Officer's duties and responsibilities under this Agreement.

The Officer shall be reasonably familiar with and strive to comply with, policies of the Bank and all applicable federal, state and local laws, ordinances, rules, regulations, guidelines and other requirements pertaining to the Mortgage Banking Business, including, but not limited, to the Equal Credit Opportunity Act, Gramm-Leach-Bliley Act, Truth in Lending Act, Real Estate Settlement Procedures Act, USA PATRIOT Act, Home Mortgage Disclosure Act, Federal Trade Commission Act, Telemarketing and Consumer Fraud and Abuse Prevention Act, Fair Credit Reporting Act, Fair Housing Act, Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (the "SAFE Act"), Dodd-Frank Wall Street Reform and Consumer Protection Act and all related regulations to the foregoing Acts, and all similar federal, state

and local laws, rules, regulations and requirements, federal and state telemarketing and do-not-call laws, rules and regulations, and all applicable guidelines and requirements of the Consumer Financial Protection Bureau ("CFPB"), the Federal Reserve Board ("Fed"), United States Department of Housing and Urban Development ("HUD"), Department of Veterans Affairs ("VA"), Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"), Federal National Mortgage Association ("FNMA" or "Fannie Mae"), Government National Mortgage Association ("GNMA" or "Ginnie Mae"), United States Department of Agriculture ("USDA") and all other applicable agencies, investors and insurers (altogether, the policies of the Bank and all such applicable laws, rules, regulations, guidelines and other requirements, the "Applicable Requirements"), in each case as amended from time to time.

**1.3** **Certain Restrictions and Requirements.** The Officer shall not, under any circumstances whatsoever, render or perform (i) any loan origination-related service or activity, or (ii) any other service or activity that would result in Officer being deemed a "loan originator" as defined in Regulation Z at 12 C.F.R. § 1026.36(a)(1) or would require the Officer to be licensed or registered as a loan originator under applicable federal or state licensing or registration laws.

The Officer shall not, and will reasonably ensure that no employee reporting directly or indirectly to the Officer does not (i) withhold or misrepresent material facts with regard to a mortgage loan applicant's income, assets, investments, debts, obligations, circumstances and information on the subject property of a loan, and/or (ii) advise a mortgage loan applicant to provide, or assist an applicant in providing, inaccurate information in relation to a loan application.

**1.4** **Term.**

(a)    The term of this Agreement shall include: (i) the initial term, consisting of the period commencing on the Effective Date and ending on February 28, 2022, plus (ii) any and all extensions of the initial term made pursuant to this Section 1.4.

(b)    Commencing on the first anniversary of the Effective Date and continuing as of each anniversary of the Effective Date thereafter (the "Renewal Date"), the disinterested directors on the Board may extend the Agreement term for an additional year so that the remaining term of the Agreement again becomes twelve (12) full months from the applicable Renewal Date, unless the Officer elects not to extend the term of this Agreement by giving written notice at least thirty (30) days prior to the applicable anniversary date.

(c)    The disinterested directors on the Board will review the Agreement and the Officer's performance annually for the purpose of determining whether to extend the Agreement term and will include the rationale and results of the review in the minutes of the meetings.  The Board will notify the Officer no earlier than sixty (60) days and no later than thirty (30) days prior to the applicable anniversary date whether it has determined to extend the Agreement.

(d)    Nothing in this Agreement shall mandate or prohibit the continuation of the Officer's employment following the expiration of the term of this Agreement, upon such terms and conditions as the Bank and the Officer may mutually agree.

## ARTICLE 2
## COMPENSATION AND BENEFITS

**2.1** **Base Salary.** In consideration of the Officer's performance of the obligations under this Agreement, the Bank shall pay or cause to be paid to the Officer a salary at the annual rate of not less than three hundred fifty thousand dollars ($350,000), payable according to the regular payroll practices of the Bank.  The Officer's salary shall be subject to annual review.  The Officer's salary, as the same may be

modified from time to time, is referred to in this Agreement as the "Base Salary". All compensation under this Agreement shall be subject to customary income tax withholding and withholding of such other employment taxes as are imposed by law.

2.2 **Profit Commission.** For each calendar month during the term of this Agreement in which the Cumulative Division Net Income (as defined below) is a positive number, the Bank shall compensate and pay the Officer an amount equal to five percent (5%) of such Cumulative Division Net Income (the "Profit Commission"). "Cumulative Division Net Income" shall mean the Division's net income, calculated from the Effective Date through the close of business on the last day of each month in accordance with accounting principles generally accepted in the United States of America ("GAAP") and excluding Profit Commission and taxes not otherwise includible in net income before taxes (i.e. net income before consideration of Profit Commission and income taxes). For the avoidance of doubt, the total cumulative Profit Commission paid to the Officer shall not exceed five percent (5%) of Cumulative Division Net Income, except when monthly net losses have occurred and until such time as subsequent monthly net income remedies the imbalance. The Profit Commission earned for a particular month shall be paid on the second payroll date in the month immediately subsequent to the month in which it was earned.

2.3 **Benefit Plans and Perquisites.** For as long as the Officer is employed by Bank, the Officer shall be eligible to (i) participate in any and all officer or employee compensation, incentive compensation and benefit plans in effect from time to time, including without limitation plans providing retirement, medical, dental, disability, and group life benefits and including stock-based compensation, incentive, or bonus plans existing on the date of this Agreement or adopted after the date of this Agreement, provided that the Officer satisfies the eligibility requirements for such plans or benefits, and (ii) receive any and all other fringe and other benefits provided from time to time, including the specific items described in (a)-(b) below. Notwithstanding the above, the Officer shall not be eligible to participate in the Bank's nonqualified All-Employee Bonus and Management Incentive Bonus plans.

(a) *Reimbursement of Business Expenses.* The Officer shall be entitled to reimbursement for all reasonable business expenses incurred while performing the obligations under this Agreement, including, but not limited to, all reasonable business travel and entertainment expenses incurred while acting at the request of or in the service of the Bank, reasonable expenses for attendance at annual and other periodic meetings of trade associations, and reasonable fees and expenses for continuing professional education. Expenses will be reimbursed if they are submitted in accordance with the policies and procedures of the Bank.

(b) *Facilities.* The Bank will furnish the Officer with the working facilities and staff customary for officers with comparable titles and duties of the Officer, as set forth in Sections 1.1 and 1.2 of this Agreement, and as are necessary for the Officer to perform the duties.

2.3 **Vacation and Leave.** The Officer shall be entitled to sick leave and paid annual vacation in accordance with policies established from time to time by the Bank and made available in writing to the Officer. In addition to paid vacations and other leave, the Board or the CEO may grant the Officer, solely at the Officer's request, voluntary Leaves of Absence, with or without pay, at such time or times and upon such terms and conditions as the Board or the CEO may determine. For purposes of this Agreement, "Leave of Absence" means a voluntary and temporary discontinuance of work duties and responsibilities by the Officer, after which the Officer may return to work duties and responsibilities, subject to terms and conditions agreed upon by the Officer, the Board and the CEO.

2.4 **Insurance.** The Bank shall maintain or cause to be maintained liability insurance, including Director & Officer insurance, covering the Officer throughout the term of this Agreement.

## ARTICLE 3
## EMPLOYMENT TERMINATION

**3.1**       **Termination Because of Death or Disability.**

(a)       _Death_. The Officer's employment shall terminate automatically at the Officer's death. If the Officer dies in active service to the Bank, the Officer's spouse or, if there is no surviving spouse, the estate, shall receive any sums due to the Officer as Base Salary and reimbursement of expenses through the end of the month in which death occurred.

(b)       _Disability_. By delivery of written notice thirty (30) days in advance to the Officer, the Bank may terminate the Officer's employment if the Officer is disabled.  For purposes of this Agreement the Officer shall be considered "disabled" if an independent physician selected by the Bank and reasonably acceptable to the Officer, or the Officer's legal representative, determines that, because of illness or accident, the Officer is unable to perform the Officer's duties and will be unable to perform the Officer's duties for a period of ninety (90) consecutive days.  The Officer shall not be considered disabled, however, if the Officer returns to work on a full-time basis within thirty (30) days after the Bank gives notice of termination due to disability.  During the period of incapacity leading up to the termination of the Officer's employment under this provision, the Bank shall continue to pay the full Base Salary at the rate then in effect and all perquisites and other benefits (other than bonuses, commissions and incentive compensation) until the Officer becomes eligible for benefits under any disability plan or insurance program maintained by the Bank, provided that the amount of the payments by the Bank to the Officer under this Section 3.1(b) shall be reduced by the sum of the amounts, if any, payable to the Officer for the same period under any disability benefit or pension plan covering the Officer.

**3.2**       **Involuntary Termination With Cause.** The Bank may terminate the Officer's employment for Cause.  If the Officer's employment terminates for Cause, the Officer shall receive the Base Salary through the date on which termination becomes effective and reimbursement of expenses to which the Officer is entitled when termination becomes effective. The Officer shall not be deemed to have been terminated for Cause under this Agreement unless and until there is delivered to the Officer a copy of a resolution adopted at a meeting of the Board called and held for the purpose, which resolution shall (i) contain findings that the Officer has committed an act constituting Cause, and (ii) specify the particulars thereof.  The resolution of the Board shall be deemed to have been duly adopted only if it is adopted by the affirmative vote of a majority of the directors of the Bank then in office, excluding the Office.  Notice of the meeting and the proposed termination for Cause shall be given to the Officer at a reasonable time, but not less than ten (10) business days, before the meeting of the Board (the "Board Meeting Notice"); provided, however, the Bank may immediately place the Officer on Paid Administrative Leave effective at the time of providing the Board Meeting Notice.  For purposes of this Agreement, "Paid Administrative Leave" means an involuntary and temporary discontinuance of work duties and responsibilities by the Officer, during which the Officer continues to receive compensation and benefits on the same terms and conditions as received immediately prior to the leave, and after which the Officer may return to work duties and responsibilities or employment is terminated.  The Officer and the Officer's counsel (if the Officer chooses to have counsel present) shall have a reasonable opportunity to be heard by the Board at the meeting. For purposes of this Agreement "Cause" means any of the following:

(a)       a material act of dishonesty in performing the Officer's duties on behalf of the Bank;

(b)       a willful misconduct that, in the judgment of the board of directors, will likely cause economic damage to the Corporation or the Bank or their Affiliates or injury to the business reputation of the Corporation or the Bank or their Affiliates;

(c)     incompetence (in determining incompetence, the Officer must have demonstrated a lack of ability to perform the duties assigned to him which lack of ability directly causes material injury to the Bank and the Officer's acts or omissions shall be measured against standards generally prevailing in the community banking industry);

(d)     a breach of fiduciary duty involving personal profit;

(e)     the intentional failure to perform stated duties under this Agreement after written notice thereof from the board of directors of the Bank;

(f)     a willful violation of any law, rule or regulation (other than minor or routine traffic violations or similar offenses) that reflects adversely on the reputation of the Corporation or the Bank or their Affiliates, any felony conviction, any violation of law involving moral turpitude, or any violation of a final cease-and-desist order;

(g)     any conduct resulting in an enforcement action against the Corporation or the Bank;

(h)     enforcement action against the Officer that results in the Officer's inability to remain in the employ of the Bank or practice in the Mortgage Banking Business;

(i)     a material breach by the Officer of any provision of this Agreement; or

(j)     a cumulative net loss by the Division in excess of one million dollars ($1,000,000) over a period of twelve (12) consecutive months, as determined in accordance with accounting principles generally accepted in the United States of America ("GAAP").

No act, or failure to act, on the Officer's part shall be considered "willful" unless the Officer has intentionally acted, or intentionally failed to act, with an absence of good faith and without reasonable belief that action or failure to act was in the best interest of the Corporation or the Bank.  The Bank must provide written notice to the Officer of the existence of one or more of the conditions described in Sections 3.2 (a) through (i) within sixty (60) days after the Bank's recognition of the existence of the condition(s) and within forty five (45) days for the condition described in Section 3.2(j) (the "Cause Notice").  The Cause Notice shall be sent not less than ten (10) days prior to the Board Meeting Notice; provided, however, the Bank may immediately place the Officer on Paid Administrative Leave effective at the time of providing the Board Meeting Notice.  Failure of the Bank to terminate the Officer's employment for Cause within thirty (30) days from the date of the Cause Notice for the conditions described in Section 3.2(i) shall be deemed a permanent waiver of Section 3.2(j) for the twelve-month period for which the notification was provided.

**3.3     Voluntary Termination by the Officer Without Good Reason.** If the Officer terminates employment without Good Reason, the Officer shall receive the Base Salary and expense reimbursement to which the Officer is entitled through the date on which termination becomes effective.

**3.4     Involuntary Termination Without Cause and Voluntary Termination With Good Reason.** With written notice to the Officer at least thirty (30) days in advance, the Bank may terminate the Officer's employment without Cause.  Termination shall take effect at the end of the notice period. With advance written notice to the Bank, as provided in clause (b), the Officer may terminate employment for Good Reason.  If the Officer's employment terminates involuntarily without Cause or voluntarily but with Good Reason, the Officer shall be entitled to the benefits specified in Article 4 of this Agreement.  For purposes of this Agreement, a voluntary termination by the Officer shall be considered a voluntary termination with Good Reason if the conditions stated in both clauses (a) and (b) of this Section 3.4 are satisfied:

(a)    a voluntary termination by the Officer shall be considered a voluntary termination with Good Reason if any of the following occur without the Officer's written consent, and the term "Good Reason" shall mean the occurrence of any of the following without the Officer's written consent:

(1)    a material diminution of the Officer's Base Salary;

(2)    a material diminution of the Officer's authority, duties, or responsibilities;

(3)    a change in the geographic location at which the Officer must perform services for the Bank by more than thirty-five (35) miles from the Officer's home office within the personal residence of Officer; or

(4)    any other action or inaction that constitutes a material breach by the Bank under this Agreement.

(b)    the Officer must give notice to the Bank of the existence of one or more of the conditions described in clause (a) within sixty (60) days after the initial existence of the condition, and the Bank shall have thirty (30) days thereafter to remedy the condition.  In addition, the Officer's voluntary termination because of the existence of one or more of the conditions described in clause (a) must occur within six (6) months after the initial existence of the condition.

## ARTICLE 4
## SEVERANCE COMPENSATION

**4.1    Cash Severance after Termination Without Cause or Termination for Good Reason.** Subject to Section 8.9 of this Agreement, if the Officer's employment terminates involuntarily but without Cause or if the Officer voluntarily terminates employment with Good Reason, the Officer shall receive from the Bank the Base Salary for the remaining term of the Agreement, with the amount paid in a single lump sum within ten (10) calendar days of termination.  The Bank and the Officer acknowledge and agree that the compensation and benefits under this Section 4.1 shall not be payable if compensation and benefits are payable or shall have been paid to the Officer under Article 5 of this Agreement.

**4.2    Post-Termination Insurance Coverage.** If the Officer's employment terminates involuntarily but without Cause or voluntarily but with Good Reason, or because of disability, the Bank shall continue to provide to the Officer non-taxable medical insurance coverage substantially comparable (and on substantially the same terms and conditions) to the coverage maintained by the Bank for the Officer immediately prior to termination under the same cost-sharing arrangements that apply for active employees of the Bank as of the Officer's date of termination.  Such continued coverage shall cease upon the earlier of (i) the Officer's return to employment with the Bank or another employer, (ii) the Officer's attainment of age 65, (iii) the Officer's death or (iv) the expiration of the remaining term of this Agreement.  The period of continued health coverage required by Section 4980B(f) of the Internal Revenue Code of 1986, as amended (the "Code"), shall run concurrently with the coverage period provided herein.  If the Bank cannot provide the benefits set forth in this paragraph for any reason, including because the Officer is no longer an employee, applicable rules and regulations prohibit the benefits in the manner contemplated, or it would subject the Bank to penalties, then the Bank shall pay the Officer a cash lump sum payment reasonably estimated to be equal to the value of the premiums the Bank would have paid for such coverage based on the premiums paid for the coverage immediately prior to termination.  Such cash payment shall be made in a lump sum within thirty (30) days after the later of the Officer's date of termination or the effective date of the rules or regulations prohibiting such benefits or subjecting the Bank to penalties.

## ARTICLE 5
## CHANGE IN CONTROL BENEFITS

**5.1**  **Change in Control Benefits.** If a Change in Control occurs during the term of this Agreement and, thereafter during the term of the Agreement, the Officer's employment terminates involuntarily but without Cause or if the Officer voluntarily terminates employment with Good Reason, the Bank shall make or cause to be made a single lump-sum payment to the Officer in an amount in cash equal to one (1) times the Officer's Base Salary (at the rate in effect immediately prior to the Change in Control or, if higher, the rate in effect when the Officer terminates employment). The payment required under this paragraph is payable no later than five (5) business days after the Officer's termination. If the Officer receives payment under this Section 5.1, the Officer shall not be entitled to any additional severance benefits under Section 4.1 of this Agreement. In addition, the Bank shall provide the Officer and dependents with the post-termination insurance coverage described in Section 4.2 of this Agreement.

**5.2**  **Change in Control Defined.** For purposes of this Agreement "Change in Control" means a change in control as defined in Section 409A of the Code and rules, regulations, and guidance of general application thereunder issued by the Department of the Treasury, including:

(a)  *Change in ownership*. a change in ownership of the Corporation or the Bank occurs on the date any one (1) person or group accumulates ownership of Corporation or Bank stock constituting more than fifty (50%) of the total fair market value or total voting power of Corporation or Bank stock,

(b)  *Change in effective control*. (i) any one (1) person or more than one (1) person acting as a group acquires within a twelve (12)-month period ownership of Corporation or Bank stock possessing thirty (30%) or more of the total voting power of Corporation or Bank stock, or (ii) a majority of the directors on the Corporation's board of directors or the Board is replaced during any twelve (12)-month period by directors whose appointment or election is not endorsed in advance by a majority of the directors on the Corporation's board of directors or the Board, or

(c)  *Change in ownership of a substantial portion of assets*. a change in ownership of a substantial portion of the Corporation's or the Bank's assets occurs if in a twelve (12)-month period any one person or more than one person acting as a group acquires from the Corporation's or the Bank's assets having a total gross fair market value equal to or exceeding forty (40%) of the total gross fair market value of all of the Corporation's or the Bank's assets immediately before the acquisition or acquisitions. For this purpose, gross fair market value means the value of the Corporation's or the Bank's assets, or the value of the assets being disposed of, determined without regard to any liabilities associated with the assets.

## ARTICLE 6
## CONFIDENTIALITY AND CREATIVE WORK

**6.1**  **Non-disclosure.** The Officer covenants and agrees not to reveal to any person, firm, or corporation any Confidential Information of any nature concerning the Corporation or the Bank or their business, or anything connected therewith. As used in this Article 6 the term "Confidential Information" means all of the confidential and proprietary information and trade secrets of the Corporation and the Bank and their Affiliates in existence on the date hereof or existing at any time during the term of this Agreement, including but not limited to:

(a)  the whole or any portion or phase of any business plans, financial information, purchasing data, supplier data, accounting data, or other financial information;

(b)      the whole or any portion or phase of any research and development information, design procedures, algorithms or processes, or other technical information;

(c)      the whole or any portion or phase of any marketing or sales information, sales records, customer lists, prices, sales projections, or other sales information; and

(d)      trade secrets, as defined from time to time by the laws of Indiana.

This Section 6.1 does not prohibit disclosure required by an order of a court having jurisdiction or a subpoena from an appropriate governmental agency or disclosure made by the Officer in the ordinary course of business and within the scope of the Officer's authority.

The term "Confidential Information" shall not include information (i) which at the time of disclosure has been published or is otherwise in the public domain; (ii) which, after disclosure, becomes part of the public domain other than through a breach of this Agreement; (iii) which was known to the recipient prior to receipt from the Officer, provided such prior knowledge can be adequately substantiated; (iv) which becomes known to a recipient from a source which legally derives such information independently of the Officer under this Agreement; (v) which is freely disclosed by the Corporation or the Bank to a third party without an obligation of confidentiality or nondisclosure; or, (vi) which is disclosed pursuant to law, regulation or lawful order or process.

**6.2**      **Return of Materials.**  The Officer agrees to immediately deliver or return to the Corporation and the Bank upon termination of employment, upon expiration of this Agreement, or as soon thereafter as possible, all written information and any other similar items furnished by the Corporation and the Bank or prepared by the Officer in connection with the Officer's services hereunder and to immediately delete all electronically stored data of the Corporation and the Bank maintained on the Officer's personal computers or communication devices (i.e. laptop, tablet, cellular phone, etc.) and to return all employer-provided computers or communication devices.  The Officer will retain no copies thereof after termination of this Agreement or termination of the Officer's employment.

**6.3**      **Creative Work.**  The Officer agrees that all creative work and work product, including but not limited to all technology, business management tools, processes, software, patents, trademarks, and copyrights developed by the Officer during the term of this Agreement, regardless of when or where such work or work product was produced, constitutes work made for hire, all rights of which are owned by the Corporation and the Bank.  The Officer hereby assigns to the Corporation and the Bank all rights, title, and interest, whether by way of copyrights, trade secret, trademark, patent, or otherwise, in all such work or work product, regardless of whether the same is subject to protection by patent, trademark, or copyright laws.

**6.4**      **Affiliates' Confidential Information is Covered.**  For purposes of this Agreement, "Affiliate" of the Corporation or the Bank includes any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the Corporation or the Bank.

**6.5**      **Injunctive Relief.**  The Officer acknowledges that it is impossible to measure in money the damages that will accrue to the Corporation and the Bank if the Officer fails to observe the obligations imposed by this Article 6.  Accordingly, if the Corporation or the Bank institutes an action to enforce the provisions hereof, the Officer hereby waives the claim or defense that an adequate remedy at law is available to the Corporation or the Bank, and the Officer agrees not to urge in any such action the claim or defense that an adequate remedy at law exists.  The confidentiality and remedies provisions of this Article 6 shall be in addition to and shall not be deemed to supersede or restrict, limit, or impair the

Corporation's or the Bank's rights under applicable state or federal statute or regulation dealing with or providing a remedy for the wrongful disclosure, misuse, or misappropriation of trade secrets or proprietary or Confidential Information.

**6.6** **Confidentiality Obligation Survives Termination.** The rights and obligations set forth in this Article 6 shall survive termination of this Agreement.

## ARTICLE 7
## SOLICITATION AND COMPETITION AFTER EMPLOYMENT TERMINATION

**7.1** **Covenant Not to Solicit Employees.** The Officer covenants and agrees not to, Directly or Indirectly, solicit or employ the services of any officer or employee of the Corporation or the Bank or an Affiliate (including an individual who was an officer or employee of the Corporation or the Bank or an Affiliate during the one (1)-year period following the Officer's termination) for two (2) years after the Officer's employment termination.

**7.2** **Covenant Not to Compete.**

(a) The Officer covenants and agrees not to Compete, Directly or Indirectly, with the Corporation or the Bank or an Affiliate for one (1) year after employment termination. For purposes of this Section 7.2:

(1) the term "Compete" means:

(i) providing Financial Products or Services on behalf of any Financial Institution for any Person residing in the Territory;

(ii) assisting (other than through the performance of ministerial or clerical duties) any Financial Institution in providing Financial Products or Services to any Person residing in the Territory; or

(iii) inducing or attempting to induce any Person who was a Customer of the Corporation or the Bank or an Affiliate at the date of the Officer's employment termination to seek Financial Products or Services from another Financial Institution.

(2) the terms "Directly" and "Indirectly" mean:

(i) acting as a consultant, officer, director, independent contractor, or employee of any Financial Institution in competition with the Corporation or the Bank or an Affiliate in the Territory; or

(ii) communicating to such Financial Institution the names or addresses or any financial information concerning any Person who was a Customer of the Corporation or the Bank or an Affiliate when the Officer's employment terminated.

(3) the term "Customer" means any Person to whom the Corporation or the Bank or an Affiliate is providing Financial Products or Services on the date of the Officer's employment termination or within one year thereafter.

(4)     the term "Financial Institution" means any bank, savings association, or bank or savings association holding company, or any other institution, the business of which is engaging in activities that are financial in nature or incidental to such financial activities as described in Section 4(k) of the Bank Holding Company Act of 1956, other than the Corporation or the Bank or an Affiliate.

(5)     the term "Financial Product or Service" means any product or service that a Financial Institution or a financial holding company could offer by engaging in any activity that is financial in nature or incidental to such a financial activity under Section 4(k) of the Bank Holding Company Act of 1956 and that is offered by the Corporation or the Bank or an Affiliate on the date of the Officer's employment termination, including but not limited to banking activities and activities that are closely related and a proper incident to banking.

(6)     the term "Person" means any individual or individuals, corporation, partnership, fiduciary or association.

(7)     the term "Territory" means the area within a twenty-five (25) mile radius of the Corporation's and the Bank's headquarters located at 702 North Shore Drive, Jeffersonville, Indiana (the "Headquarters") or any office of the Corporation or the Bank or an Affiliate in which the Bank operates a Retail Depository Branch as of the Effective Date and provided, however, that the term "Territory" shall not extend to any area outside the State of Indiana.  For purposes of this Agreement, "Retail Depository Branch" means any office location of the Bank in which consumer, personal and commercial depository services are offered and facilitated.

(b)     If any provision of this Section 7.2 or any word, phrase, clause, sentence or other portion thereof (including, without limitation, the geographical and temporal restrictions contained therein) is held to be unenforceable or invalid for any reason, the unenforceable or invalid provision or portion shall be modified or deleted so that the provisions hereof, as modified, are legal and enforceable to the fullest extent permitted under applicable law.

(c)     The Officer acknowledges that the Bank's willingness to enter into this Agreement and to make the payments contemplated by Articles 3 and 4 of this Agreement is conditioned on the Officer's acceptance of and adherence to the covenants set forth in Articles 6 and 7 of this Agreement and that the Bank would not have entered into this Agreement without such covenants in force.

**7.3     <u>Injunctive and Other Relief.</u>** Because of the unique character of the services to be rendered by the Officer hereunder, the Officer understands that the Corporation and the Bank would not have an adequate remedy at law for the material breach or threatened breach by the Officer of any one or more of the Officer's covenants in this Article 7. Accordingly, the Officer agrees that the Corporation's and the Bank's remedies for a breach of this Article 7 include, but are not limited to, (i) forfeiture of any money representing accrued salary, bonuses, commissions and incentive compensation; contingent payments; or other fringe benefits (including any amount payable pursuant to Article 4) due and payable to the Officer during the period of any breach by Officer, (ii) a suit in equity by the Corporation or the Bank to enjoin the Officer from the breach or threatened breach of such covenants, and (iii) its attorney's fees and costs incurred to enforce the rights of the Corporation or the Bank under any article of this Agreement. The Officer hereby waives the claim or defense that an adequate remedy at law is available to the Corporation or the Bank and the Officer agrees not to urge in any such action the claim or defense that an adequate remedy at law exists. Nothing herein shall be construed to prohibit the Corporation or the Bank from pursuing any other or additional remedies for the breach or threatened breach.

**7.4**     **Article 7 Survives Termination But Is Void Upon a Change in Control.** The rights and obligations set forth in this Article 7 shall survive termination of this Agreement.  However, Article 7 shall become null and void effective immediately upon a Change in Control if the Officer is employed by the Bank at the effective time of the Change in Control.

# ARTICLE 8
## MISCELLANEOUS

**8.1**     **Successors and Assigns.**

(a)     This Agreement shall be binding upon the Bank and any successors to the Bank, including any persons acquiring directly or indirectly all or substantially all of the business or assets of the Bank by purchase, merger, consolidation, reorganization, or otherwise, but this Agreement and the Bank's obligations under this Agreement are not otherwise assignable, transferable, or delegable by the Bank.  By agreement in form and substance satisfactory to the Officer, the Bank shall require any successor to all or substantially all of the business or assets of the Bank expressly to assume and agree to perform this Agreement in the same manner and to the same extent the Bank would be required to perform had no succession occurred.

(b)     This Agreement shall inure to the benefit of and be enforceable by the Officer's personal or legal representatives, executors, administrators, successors, heirs, distributees, and legatees.

(c)     Without written consent of the other parties, no party shall assign, transfer, or delegate this Agreement or any rights or obligations under this Agreement, except as expressly provided herein. Without limiting the generality or effect of the foregoing, the Officer's right to receive payments hereunder is not assignable or transferable, whether by pledge, creation of a security interest, or otherwise, except for a transfer by the Officer's will or by the laws of descent and distribution. If the Officer attempts an assignment or transfer that is contrary to this Section 8.1, the Bank shall have no liability to pay any amount to the assignee or transferee.

**8.2**     **Governing Law, Jurisdiction and Forum.** This Agreement shall be construed under and governed by the internal laws of the State of Indiana, without giving effect to any conflict of laws provision or rule that would cause the application of the laws of any jurisdiction other than Indiana.  By entering into this Agreement, the Officer acknowledges that the Officer is subject to the jurisdiction of both the federal and state courts in Indiana.

**8.3**     **Entire Agreement.** This Agreement sets forth the entire agreement of the parties concerning the employment of the Officer by the Bank.  Any oral or written statements, representations, agreements, or understandings made or entered into prior to or contemporaneously with the execution of this Agreement are hereby rescinded, revoked, and rendered null and void by the parties.

**8.4**     **Notices.** All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand or mailed, certified or registered mail, return receipt requested, with postage prepaid.  Unless otherwise changed by notice, notice shall be properly addressed to the Officer if addressed to the address of the Officer on the books and records of the Bank at the time of the delivery of such notice, and properly addressed to the Bank if addressed to the Board at the Headquarters.

**8.5** **Severability.** If there is a conflict between any provision of this Agreement and any statute, regulation, or judicial precedent, the latter shall prevail, but the affected provisions of this Agreement shall be curtailed and limited solely to the extent necessary to bring them within the requirements of law.  If any provisions of this Agreement is held by a court of competent jurisdiction to be indefinite, invalid, void or voidable, or otherwise unenforceable, the remainder of this Agreement shall continue in full force and effect unless that would clearly be contrary to the intentions of the parties or would result in an injustice.

**8.6** **Captions and Counterparts.** The captions in this Agreement are solely for convenience. The captions do not define, limit, or describe the scope or intent of this Agreement.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

**8.7** **No Duty to Mitigate.**  The Officer shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment. Moreover, provided the Officer is not in breach of any obligation under Articles 6 and 7 of this Agreement, the amount of any payment provided for in this Agreement shall not be reduced by any compensation earned or benefits provided as the result of employment of the Officer or as a result of the Officer being self-employed after employment termination.

**8.8** **Amendment and Waiver.** This Agreement may not be amended, released, discharged, abandoned, changed, or modified in any manner, except by an instrument in writing signed by each of the parties hereto.  The failure of any party hereto to enforce at any time any of the provisions of this Agreement shall not be construed to be a waiver of any such provision, nor affect the validity of this Agreement or any part thereof or the right of any party thereafter to enforce each and every such provision.  No waiver or any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

**8.9** **Compliance with Internal Revenue Code Section 409A.**

(a)      The Bank and the Officer intend that their exercise of authority or discretion under this Agreement shall comply with Section 409A of the Code.  If any provision of this Agreement does not satisfy the requirements of Section 409A of the Code, such provision shall nevertheless be applied in a manner consistent with those requirements.  If any provision of this Agreement would subject the Officer to additional tax or interest under Section 409A of the Code, the Bank shall reform the provision. However, the Bank shall maintain to the maximum extent practicable the original intent of the applicable provision without subjecting the Officer to additional tax or interest, and the Bank shall not be required to incur any additional compensation expense as a result of the reformed provision.

(b)      This Agreement is intended to comply with the requirements of Section 409A of the Code, and specifically, where applicable, with the "short-term deferral exception" under Treasury Regulation Section 1.409A-1(b)(4) and the "separation pay exception" under Treasury Regulation Section 1.409A-1(b)(9)(iii), and shall in all respects be administered in accordance with Section 409A of the Code. If any payment or benefit hereunder cannot be provided or made at the time specified herein without incurring sanctions on the Officer under Section 409A of the Code, then such payment or benefit shall be provided in full at the earliest time thereafter when such sanctions will not be imposed. For purposes of Section 409A of the Code, all payments to be made upon a termination of employment under this Agreement may only be made upon a "separation from service" (within the meaning of such term under Section 409A of the Code), each payment made under this Agreement shall be treated as a separate payment, the right to a series of installment payments under this Agreement (if any) is to be treated as a right to a series of separate payments, and if a payment is not made by the designated payment date under

this Agreement, the payment shall be made by December 31 of the calendar year in which the designated date occurs. To the extent that any payment provided for hereunder would be subject to additional tax under Section 409A of the Code, or would cause the administration of this Agreement to fail to satisfy the requirements of Section 409A of the Code, such provision shall be deemed null and void to the extent permitted by applicable law, and any such amount shall be payable in accordance with Section 8.9(c). In no event shall the Officer, directly or indirectly, designate the calendar year of payment.

(c)     Notwithstanding anything herein to the contrary, if the Officer is a "specified employee" (within the meaning of Section 409A of the Code) and it is necessary to postpone the commencement of any payments or benefits otherwise payable under this Agreement as a result of the Officer's separation from service with the Bank to prevent any accelerated or additional tax under Section 409A of the Code, then the Bank will postpone the commencement of the payment of any such payments or benefits hereunder (without any reduction in such payments or benefits ultimately paid or provided to the Officer) that are not otherwise paid with the "short-term deferral exception" under Treasury Regulations Section 1.409A-1(b)(4) and the "separation pay exception" under Treasury Regulations Section 1.409A-1(b)(9)(iii), until the first payroll date that occurs after the date that is six (6) months following the Officer's separation of service with the Bank. If any payments are postponed due to such requirements, such postponed amounts will be paid to the Officer in a lump sum on the first payroll date that occurs after the date that is six (6) months following the Officer's separation of service with the Bank. If the Officer dies during the postponement period prior to the payment of postponed amount, the amounts withheld on account of Section 409(A) of the Code shall be paid to the personal representative of the Officer's estate within sixty (60) days after the date of the Officer's death.

**8.10     Required Provisions.**  In the event any of the foregoing provisions of this Agreement conflict with the terms of this Section 8.10, this Section 8.10 shall prevail.

(a)     All obligations under this Agreement shall be terminated, except to the extent a determination is made that continuation of the contract is necessary for the continued operation of the Bank (i) by the Comptroller of the Currency, or designee (the "Comptroller"), at the time the Federal Deposit Insurance Corporation enters into an agreement to provide assistance to or on behalf of the Bank under the authority contained in Section 13(c) of the FDIA; or (ii) by the Comptroller, at the time the Comptroller approves a supervisory merger to resolve problems related to operation of the Bank or when the Bank is determined by the Comptroller to be in an unsafe and unsound condition. Any rights of the Officer that have already vested, however, shall not be affected by such action.

(b)     Any payments made to the Officer pursuant to this Agreement, or otherwise, are subject to, and conditioned upon, their compliance with 12 U.S.C. Section 1828(k) and FDIC Regulation 12 C.F.R. Part 359, Golden Parachute and Indemnification Payments.

**[signature page follows]**

**IN WITNESS WHEREOF,** the parties have executed this Employment Agreement as of the date first written above.

**FIRST SAVINGS BANK**

_____

Chairman of the Board of Directors

**OFFICER**

_____

Brian A. Simon

# Exhibit "E"

From: **Brian Simon, CMB** <bsimon@fsbmortgage.com>
Date: Tue, Aug 2, 2022 at 12:42 PM
Subject: FW: Employment Agreement - Final
To: basimon407@gmail.com <basimon407@gmail.com>



**Brian Simon, CMB**
SVP, Mortgage Banking Director
First Savings Bank | www.fsbmortgage.com
501 E Lewis and Clark Pkwy | Clarksville, IN 47129
bsimon@fsbmortgage.com | 502.631.9153

   

Click Here to Send Me a Secure Email

Instructions to Send Me a Secure Email

*This transmission cannot be guaranteed to be secure or error free as information could be intercepted, corrupted, lost, destroyed, or contain viruses. The sender, therefore, does not accept liability for any errors or omissions in the contents of this message, which arise as a result of this transmission. The information in this email is confidential, may be privileged, and is intended solely for the use of the person addressed. Access to this email by anyone else is unauthorized. If you are not the intended recipient or a person authorized to deliver it to the named addressee, do not read, copy, retain, or disseminate this message or any attachment. If you have received this message in error, please notify the sender by return e-mail and delete this message and any attachments from your system.*

**From:** Tony A. Schoen, CPA <tschoen@fsbbank.net>
**Sent:** Friday, April 30, 2021 12:01 PM
**To:** Brian Simon, CMB <bsimon@fsbbankwl.com>
**Subject:** Employment Agreement - Final

Hey BS,

I've made the revision you suggested in Section 4.1, as follows, which excludes the previous limitation of the amount to the remaining term of the agreement.  No other revisions were made.

    **4.1**       **<u>Cash Severance after Termination Without Cause or Termination for Good Reason</u>**.  Subject to Section 8.9 of this Agreement, if the Officer's employment terminates involuntarily but without Cause or if the Officer voluntarily terminates employment with Good Reason, <mark>the Officer shall receive from the Bank the Base Salary</mark>, with the amount paid in a single lump sum within ten (10) calendar days of termination.  The Bank and the Officer acknowledge and agree that the compensation and benefits under this Section 4.1 shall not be payable if compensation and benefits are payable or shall have been paid to the Officer under Article 5 of this Agreement.

If you're good with this, please execute and return a scanned copy of the signature page.  I'll send you a copy of the Chairman executed signature page this afternoon, once I receive it.

Thanks,

Tony



**Tony A. Schoen, CPA**
Chief Financial Officer
First Savings Bank  |  www.fsbbank.net
702 North Shore Drive, Suite 300  |  Jeffersonville, IN 47130
tschoen@fsbbank.net  |  812.218.6807 direct  |  812.670.3735 fax

   

<u>Send Me a Secure Email</u>

<u>Instructions to Send Me a Secure Email</u>

*This transmission cannot be guaranteed to be secure or error free as information could be intercepted, corrupted, lost, destroyed, or contain viruses. The sender, therefore, does not accept liability for any errors or omissions in the contents of this message, which arise as a result of this transmission. The information in this email is confidential, may be privileged, and is intended solely for the use of the person addressed. Access to this email by anyone else is unauthorized. If you are not the intended recipient or a person authorized to deliver it to the named addressee, do not read, copy, retain, or disseminate this message or any attachment. If you have received this message in error, please notify the sender by return e-mail and delete this message and any attachments from your system.*

**Tony A. Schoen, CPA**
Chief Financial Officer

First Savings Bank | www.fsbbank.net

702 North Shore Drive, Suite 300 | Jeffersonville, IN   47130

tschoen@fsbbank.net | 812.218.6807 direct | 812.670.3735 fax

   

Click Here to Send Me a Secure Email

Instructions to Send Me a Secure Email

*This transmission cannot be guaranteed to be secure or error free as information could be intercepted, corrupted, lost, destroyed, or contain viruses. The sender, therefore, does not accept liability for any errors or omissions in the contents of this message, which arise as a result of this transmission. The information in this email is confidential, may be privileged, and is intended solely for the use of the person addressed. Access to this email by anyone else is unauthorized. If you are not the intended recipient or a person authorized to deliver it to the named addressee, do not read, copy, retain, or disseminate this message or any attachment. If you have received this message in error, please notify the sender by return e-mail and delete this message and any attachments from your system.*

--
Brian A. Simon
(215) 779-0979
basimon407@gmail.com

**EMPLOYMENT AGREEMENT**

This **EMPLOYMENT AGREEMENT** (the "Agreement") is entered into effective as of March 1, 2021 (the "Effective Date"), by and between **BRIAN A. SIMON** (the "Officer") and **FIRST SAVINGS BANK** (the "Bank"), a state-chartered commercial bank and wholly-owned subsidiary of **FIRST SAVINGS FINANCIAL GROUP, INC.** (the "Corporation").

**WHEREAS,** the Officer serves in a position of substantial responsibility with the Bank;

**WHEREAS,** the Bank wishes to set forth the terms of the Officer's continued employment in this position; and

**WHEREAS,** the Officer is willing and desires to continue to serve in this position with the Bank.

**NOW THEREFORE,** in consideration of these premises, the mutual covenants contained herein, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows.

**ARTICLE 1**
**EMPLOYMENT**

**1.1** <u>**Employment**</u>. The Bank hereby employs the Officer to serve as Senior Vice President and Mortgage Banking Director of the Bank according to the terms and conditions of this Agreement and for the period stated in Section 1.4 of this Agreement. The Officer hereby accepts employment according to the terms and conditions of this Agreement and for the period stated in Section 1.4 of this Agreement.

**1.2** <u>**Duties.**</u> As Senior Vice President and Mortgage Banking Director of the Bank, the Officer shall serve as the chief officer of the Bank's Mortgage Banking business segment (the "Mortgage Banking Division" or the "Division"). For purposes of this Agreement, "Mortgage Banking Business" means the business of prospecting, originating, closing, funding, hedging, selling and settling residential mortgage loans. The Officer shall report directly to an executive vice president of the Bank. The Officer shall serve the Bank faithfully, diligently, competently, and to the best of the Officer's ability.

The Officer shall exclusively devote full working time, energy, and attention to the business of the Bank and to the promotion of the interests of the Bank throughout the term of this Agreement. Without the prior written consent of the Board, during the term of this Agreement, the Officer shall not render services to or for any person, firm, corporation, or other entity or organization in exchange for compensation, regardless of the form in which the compensation is paid and regardless of whether it is paid directly or indirectly to the Officer. Nothing in this Section 1.2 shall prevent the Officer from managing personal investments and affairs, serving on civic boards or performing volunteer services, provided that doing so does not interfere with the proper performance of the Officer's duties and responsibilities under this Agreement.

The Officer shall be reasonably familiar with and strive to comply with, policies of the Bank and all applicable federal, state and local laws, ordinances, rules, regulations, guidelines and other requirements pertaining to the Mortgage Banking Business, including, but not limited, to the Equal Credit Opportunity Act, Gramm-Leach-Bliley Act, Truth in Lending Act, Real Estate Settlement Procedures Act, USA PATRIOT Act, Home Mortgage Disclosure Act, Federal Trade Commission Act, Telemarketing and Consumer Fraud and Abuse Prevention Act, Fair Credit Reporting Act, Fair Housing Act, Secure and Fair Enforcement for Mortgage Licensing Act of 2008 (the "SAFE Act"), Dodd-Frank Wall Street Reform and Consumer Protection Act and all related regulations to the foregoing Acts, and all similar federal, state

and local laws, rules, regulations and requirements, federal and state telemarketing and do-not-call laws, rules and regulations, and all applicable guidelines and requirements of the Consumer Financial Protection Bureau ("CFPB"), the Federal Reserve Board ("Fed"), United States Department of Housing and Urban Development ("HUD"), Department of Veterans Affairs ("VA"), Federal Home Loan Mortgage Corporation ("FHLMC" or "Freddie Mac"), Federal National Mortgage Association ("FNMA" or "Fannie Mae"), Government National Mortgage Association ("GNMA" or "Ginnie Mae"), United States Department of Agriculture ("USDA") and all other applicable agencies, investors and insurers (altogether, the policies of the Bank and all such applicable laws, rules, regulations, guidelines and other requirements, the "Applicable Requirements"), in each case as amended from time to time.

**1.3**    **Certain Restrictions and Requirements.** The Officer shall not, under any circumstances whatsoever, render or perform (i) any loan origination-related service or activity, or (ii) any other service or activity that would result in Officer being deemed a "loan originator" as defined in Regulation Z at 12 C.F.R. § 1026.36(a)(1) or would require the Officer to be licensed or registered as a loan originator under applicable federal or state licensing or registration laws.

The Officer shall not, and will reasonably ensure that no employee reporting directly or indirectly to the Officer does not (i) withhold or misrepresent material facts with regard to a mortgage loan applicant's income, assets, investments, debts, obligations, circumstances and information on the subject property of a loan, and/or (ii) advise a mortgage loan applicant to provide, or assist an applicant in providing, inaccurate information in relation to a loan application.

**1.4**    **Term.**

(a)    The term of this Agreement shall include: (i) the initial term, consisting of the period commencing on the Effective Date and ending on February 28, 2022, plus (ii) any and all extensions of the initial term made pursuant to this Section 1.4.

(b)    Commencing on the first anniversary of the Effective Date and continuing as of each anniversary of the Effective Date thereafter (the "Renewal Date"), the disinterested directors on the Board may extend the Agreement term for an additional year so that the remaining term of the Agreement again becomes twelve (12) full months from the applicable Renewal Date, unless the Officer elects not to extend the term of this Agreement by giving written notice at least thirty (30) days prior to the applicable anniversary date.

(c)    The disinterested directors on the Board will review the Agreement and the Officer's performance annually for the purpose of determining whether to extend the Agreement term and will include the rationale and results of the review in the minutes of the meetings.  The Board will notify the Officer no earlier than sixty (60) days and no later than thirty (30) days prior to the applicable anniversary date whether it has determined to extend the Agreement.

(d)    Nothing in this Agreement shall mandate or prohibit the continuation of the Officer's employment following the expiration of the term of this Agreement, upon such terms and conditions as the Bank and the Officer may mutually agree.

## ARTICLE 2
## COMPENSATION AND BENEFITS

**2.1**    **Base Salary.**  In consideration of the Officer's performance of the obligations under this Agreement, the Bank shall pay or cause to be paid to the Officer a salary at the annual rate of not less than three hundred fifty thousand dollars ($350,000), payable according to the regular payroll practices of the Bank.  The Officer's salary shall be subject to annual review.  The Officer's salary, as the same may be

modified from time to time, is referred to in this Agreement as the "Base Salary". All compensation under this Agreement shall be subject to customary income tax withholding and withholding of such other employment taxes as are imposed by law.

**2.2**     **Profit Commission.**  For each calendar month during the term of this Agreement in which the Cumulative Division Net Income (as defined below) is a positive number, the Bank shall compensate and pay the Officer an amount equal to five percent (5%) of such Cumulative Division Net Income (the "Profit Commission").  "Cumulative Division Net Income" shall mean the Division's net income, calculated from the Effective Date through the close of business on the last day of each month in accordance with accounting principles generally accepted in the United States of America ("GAAP") and excluding Profit Commission and taxes not otherwise includible in net income before taxes (i.e. net income before consideration of Profit Commission and income taxes).  For the avoidance of doubt, the total cumulative Profit Commission paid to the Officer shall not exceed five percent (5%) of Cumulative Division Net Income, except when monthly net losses have occurred and until such time as subsequent monthly net income remedies the imbalance.  The Profit Commission earned for a particular month shall be paid on the second payroll date in the month immediately subsequent to the month in which it was earned.

**2.3**     **Benefit Plans and Perquisites.** For as long as the Officer is employed by Bank, the Officer shall be eligible to (i) participate in any and all officer or employee compensation, incentive compensation and benefit plans in effect from time to time, including without limitation plans providing retirement, medical, dental, disability, and group life benefits and including stock-based compensation, incentive, or bonus plans existing on the date of this Agreement or adopted after the date of this Agreement, provided that the Officer satisfies the eligibility requirements for such plans or benefits, and (ii) receive any and all other fringe and other benefits provided from time to time, including the specific items described in (a)-(b) below.  Notwithstanding the above, the Officer shall not be eligible to participate in the Bank's nonqualified All-Employee Bonus and Management Incentive Bonus plans.

(a)     *Reimbursement of Business Expenses.* The Officer shall be entitled to reimbursement for all reasonable business expenses incurred while performing the obligations under this Agreement, including, but not limited to, all reasonable business travel and entertainment expenses incurred while acting at the request of or in the service of the Bank, reasonable expenses for attendance at annual and other periodic meetings of trade associations, and reasonable fees and expenses for continuing professional education.  Expenses will be reimbursed if they are submitted in accordance with the policies and procedures of the Bank.

(b)     *Facilities*.  The Bank will furnish the Officer with the working facilities and staff customary for officers with comparable titles and duties of the Officer, as set forth in Sections 1.1 and 1.2 of this Agreement, and as are necessary for the Officer to perform the duties.

**2.4**     **Vacation and Leave.** The Officer shall be entitled to sick leave and paid annual vacation in accordance with policies established from time to time by the Bank and made available in writing to the Officer.  In addition to paid vacations and other leave, the Board or the CEO may grant the Officer, solely at the Officer's request, voluntary Leaves of Absence, with or without pay, at such time or times and upon such terms and conditions as the Board or the CEO may determine.  For purposes of this Agreement, "Leave of Absence" means a voluntary and temporary discontinuance of work duties and responsibilities by the Officer, after which the Officer may return to work duties and responsibilities, subject to terms and conditions agreed upon by the Officer, the Board and the CEO.

**2.5**     **Insurance.** The Bank shall maintain or cause to be maintained liability insurance, including Director & Officer insurance, covering the Officer throughout the term of this Agreement.

## ARTICLE 3
## EMPLOYMENT TERMINATION

### 3.1     Termination Because of Death or Disability.

(a)      *Death*. The Officer's employment shall terminate automatically at the Officer's death. If the Officer dies in active service to the Bank, the Officer's spouse or, if there is no surviving spouse, the estate, shall receive any sums due to the Officer as Base Salary and reimbursement of expenses through the end of the month in which death occurred.

(b)      *Disability*. By delivery of written notice thirty (30) days in advance to the Officer, the Bank may terminate the Officer's employment if the Officer is disabled.  For purposes of this Agreement the Officer shall be considered "disabled" if an independent physician selected by the Bank and reasonably acceptable to the Officer, or the Officer's legal representative, determines that, because of illness or accident, the Officer is unable to perform the Officer's duties and will be unable to perform the Officer's duties for a period of ninety (90) consecutive days.  The Officer shall not be considered disabled, however, if the Officer returns to work on a full-time basis within thirty (30) days after the Bank gives notice of termination due to disability.  During the period of incapacity leading up to the termination of the Officer's employment under this provision, the Bank shall continue to pay the full Base Salary at the rate then in effect and all perquisites and other benefits (other than bonuses, commissions and incentive compensation) until the Officer becomes eligible for benefits under any disability plan or insurance program maintained by the Bank, provided that the amount of the payments by the Bank to the Officer under this Section 3.1(b) shall be reduced by the sum of the amounts, if any, payable to the Officer for the same period under any disability benefit or pension plan covering the Officer.

### 3.2     Involuntary Termination With Cause. The Bank may terminate the Officer's employment for Cause.  If the Officer's employment terminates for Cause, the Officer shall receive the Base Salary through the date on which termination becomes effective and reimbursement of expenses to which the Officer is entitled when termination becomes effective. The Officer shall not be deemed to have been terminated for Cause under this Agreement unless and until there is delivered to the Officer a copy of a resolution adopted at a meeting of the Board called and held for the purpose, which resolution shall (i) contain findings that the Officer has committed an act constituting Cause, and (ii) specify the particulars thereof.  The resolution of the Board shall be deemed to have been duly adopted only if it is adopted by the affirmative vote of a majority of the directors of the Bank then in office, excluding the Office.  Notice of the meeting and the proposed termination for Cause shall be given to the Officer at a reasonable time, but not less than ten (10) business days, before the meeting of the Board (the "Board Meeting Notice"); provided, however, the Bank may immediately place the Officer on Paid Administrative Leave effective at the time of providing the Board Meeting Notice.  For purposes of this Agreement, "Paid Administrative Leave" means an involuntary and temporary discontinuance of work duties and responsibilities by the Officer, during which the Officer continues to receive compensation and benefits on the same terms and conditions as received immediately prior to the leave, and after which the Officer may return to work duties and responsibilities or employment is terminated.  The Officer and the Officer's counsel (if the Officer chooses to have counsel present) shall have a reasonable opportunity to be heard by the Board at the meeting. For purposes of this Agreement "Cause" means any of the following:

(a)      a material act of dishonesty in performing the Officer's duties on behalf of the Bank;

(b)      a willful misconduct that, in the judgment of the board of directors, will likely cause economic damage to the Corporation or the Bank or their Affiliates or injury to the business reputation of the Corporation or the Bank or their Affiliates;

(c)      incompetence (in determining incompetence, the Officer must have demonstrated a lack of ability to perform the duties assigned to him which lack of ability directly causes material injury to the Bank and the Officer's acts or omissions shall be measured against standards generally prevailing in the community banking industry);

(d)      a breach of fiduciary duty involving personal profit;

(e)      the intentional failure to perform stated duties under this Agreement after written notice thereof from the board of directors of the Bank;

(f)      a willful violation of any law, rule or regulation (other than minor or routine traffic violations or similar offenses) that reflects adversely on the reputation of the Corporation or the Bank or their Affiliates, any felony conviction, any violation of law involving moral turpitude, or any violation of a final cease-and-desist order;

(g)      any conduct resulting in an enforcement action against the Corporation or the Bank;

(h)      enforcement action against the Officer that results in the Officer's inability to remain in the employ of the Bank or practice in the Mortgage Banking Business;

(i)      a material breach by the Officer of any provision of this Agreement; or

(j)      a cumulative net loss by the Division in excess of one million dollars ($1,000,000) over a period of twelve (12) consecutive months, as determined in accordance with accounting principles generally accepted in the United States of America ("GAAP").

No act, or failure to act, on the Officer's part shall be considered "willful" unless the Officer has intentionally acted, or intentionally failed to act, with an absence of good faith and without reasonable belief that action or failure to act was in the best interest of the Corporation or the Bank.  The Bank must provide written notice to the Officer of the existence of one or more of the conditions described in Sections 3.2 (a) through (i) within sixty (60) days after the Bank's recognition of the existence of the condition(s) and within forty five (45) days for the condition described in Section 3.2(j) (the "Cause Notice").  The Cause Notice shall be sent not less than ten (10) days prior to the Board Meeting Notice; provided, however, the Bank may immediately place the Officer on Paid Administrative Leave effective at the time of providing the Board Meeting Notice.  Failure of the Bank to terminate the Officer's employment for Cause within thirty (30) days from the date of the Cause Notice for the conditions described in Section 3.2(i) shall be deemed a permanent waiver of Section 3.2(j) for the twelve-month period for which the notification was provided.

**3.3**      **Voluntary Termination by the Officer Without Good Reason.** If the Officer terminates employment without Good Reason, the Officer shall receive the Base Salary and expense reimbursement to which the Officer is entitled through the date on which termination becomes effective.

**3.4**      **Involuntary Termination Without Cause and Voluntary Termination With Good Reason.** With written notice to the Officer at least thirty (30) days in advance, the Bank may terminate the Officer's employment without Cause.  Termination shall take effect at the end of the notice period.  With advance written notice to the Bank, as provided in clause (b), the Officer may terminate employment for Good Reason.  If the Officer's employment terminates involuntarily without Cause or voluntarily but with Good Reason, the Officer shall be entitled to the benefits specified in Article 4 of this Agreement.  For purposes of this Agreement, a voluntary termination by the Officer shall be considered a voluntary termination with Good Reason if the conditions stated in both clauses (a) and (b) of this Section 3.4 are satisfied:

(a)      a voluntary termination by the Officer shall be considered a voluntary termination with Good Reason if any of the following occur without the Officer's written consent, and the term "Good Reason" shall mean the occurrence of any of the following without the Officer's written consent:

(1)      a material diminution of the Officer's Base Salary;

(2)      a material diminution of the Officer's authority, duties, or responsibilities;

(3)      a change in the geographic location at which the Officer must perform services for the Bank by more than thirty-five (35) miles from the Officer's home office within the personal residence of Officer; or

(4)      any other action or inaction that constitutes a material breach by the Bank under this Agreement.

(b)      the Officer must give notice to the Bank of the existence of one or more of the conditions described in clause (a) within sixty (60) days after the initial existence of the condition, and the Bank shall have thirty (30) days thereafter to remedy the condition.  In addition, the Officer's voluntary termination because of the existence of one or more of the conditions described in clause (a) must occur within six (6) months after the initial existence of the condition.

### ARTICLE 4
### SEVERANCE COMPENSATION

**4.1     Cash Severance after Termination Without Cause or Termination for Good Reason.** Subject to Section 8.9 of this Agreement, if the Officer's employment terminates involuntarily but without Cause or if the Officer voluntarily terminates employment with Good Reason, the Officer shall receive from the Bank the Base Salary, with the amount paid in a single lump sum within ten (10) calendar days of termination.  The Bank and the Officer acknowledge and agree that the compensation and benefits under this Section 4.1 shall not be payable if compensation and benefits are payable or shall have been paid to the Officer under Article 5 of this Agreement.

**4.2     Post-Termination Insurance Coverage.** If the Officer's employment terminates involuntarily but without Cause or voluntarily but with Good Reason, or because of disability, the Bank shall continue to provide to the Officer non-taxable medical insurance coverage substantially comparable (and on substantially the same terms and conditions) to the coverage maintained by the Bank for the Officer immediately prior to termination under the same cost-sharing arrangements that apply for active employees of the Bank as of the Officer's date of termination.  Such continued coverage shall cease upon the earlier of (i) the Officer's return to employment with the Bank or another employer, (ii) the Officer's attainment of age 65, (iii) the Officer's death or (iv) the expiration of the remaining term of this Agreement.  The period of continued health coverage required by Section 4980B(f) of the Internal Revenue Code of 1986, as amended (the "Code"), shall run concurrently with the coverage period provided herein.  If the Bank cannot provide the benefits set forth in this paragraph for any reason, including because the Officer is no longer an employee, applicable rules and regulations prohibit the benefits in the manner contemplated, or it would subject the Bank to penalties, then the Bank shall pay the Officer a cash lump sum payment reasonably estimated to be equal to the value of the premiums the Bank would have paid for such coverage based on the premiums paid for the coverage immediately prior to termination.  Such cash payment shall be made in a lump sum within thirty (30) days after the later of the Officer's date of termination or the effective date of the rules or regulations prohibiting such benefits or subjecting the Bank to penalties.

**ARTICLE 5**
**CHANGE IN CONTROL BENEFITS**

**5.1    Change in Control Benefits.** If a Change in Control occurs during the term of this Agreement and, thereafter during the term of the Agreement, the Officer's employment terminates involuntarily but without Cause or if the Officer voluntarily terminates employment with Good Reason, the Bank shall make or cause to be made a single lump-sum payment to the Officer in an amount in cash equal to one (1) times the Officer's Base Salary (at the rate in effect immediately prior to the Change in Control or, if higher, the rate in effect when the Officer terminates employment). The payment required under this paragraph is payable no later than five (5) business days after the Officer's termination. If the Officer receives payment under this Section 5.1, the Officer shall not be entitled to any additional severance benefits under Section 4.1 of this Agreement. In addition, the Bank shall provide the Officer and dependents with the post-termination insurance coverage described in Section 4.2 of this Agreement.

**5.2    Change in Control Defined.** For purposes of this Agreement "Change in Control" means a change in control as defined in Section 409A of the Code and rules, regulations, and guidance of general application thereunder issued by the Department of the Treasury, including:

(a)    *Change in ownership.* a change in ownership of the Corporation or the Bank occurs on the date any one (1) person or group accumulates ownership of Corporation or Bank stock constituting more than fifty (50%) of the total fair market value or total voting power of Corporation or Bank stock,

(b)    *Change in effective control.* (i) any one (1) person or more than one (1) person acting as a group acquires within a twelve (12)-month period ownership of Corporation or Bank stock possessing thirty (30%) or more of the total voting power of Corporation or Bank stock, or (ii) a majority of the directors on the Corporation's board of directors or the Board is replaced during any twelve (12)-month period by directors whose appointment or election is not endorsed in advance by a majority of the directors on the Corporation's board of directors or the Board, or

(c)    *Change in ownership of a substantial portion of assets.* a change in ownership of a substantial portion of the Corporation's or the Bank's assets occurs if in a twelve (12)-month period any one person or more than one person acting as a group acquires from the Corporation's or the Bank's assets having a total gross fair market value equal to or exceeding forty (40%) of the total gross fair market value of all of the Corporation's or the Bank's assets immediately before the acquisition or acquisitions. For this purpose, gross fair market value means the value of the Corporation's or the Bank's assets, or the value of the assets being disposed of, determined without regard to any liabilities associated with the assets.

**ARTICLE 6**
**CONFIDENTIALITY AND CREATIVE WORK**

**6.1    Non-disclosure.** The Officer covenants and agrees not to reveal to any person, firm, or corporation any Confidential Information of any nature concerning the Corporation or the Bank or their business, or anything connected therewith. As used in this Article 6 the term "Confidential Information" means all of the confidential and proprietary information and trade secrets of the Corporation and the Bank and their Affiliates in existence on the date hereof or existing at any time during the term of this Agreement, including but not limited to:

(a)    the whole or any portion or phase of any business plans, financial information, purchasing data, supplier data, accounting data, or other financial information;

       (b)     the whole or any portion or phase of any research and development information, design procedures, algorithms or processes, or other technical information;

       (c)     the whole or any portion or phase of any marketing or sales information, sales records, customer lists, prices, sales projections, or other sales information; and

       (d)     trade secrets, as defined from time to time by the laws of Indiana.

This Section 6.1 does not prohibit disclosure required by an order of a court having jurisdiction or a subpoena from an appropriate governmental agency or disclosure made by the Officer in the ordinary course of business and within the scope of the Officer's authority.

The term "Confidential Information" shall not include information (i) which at the time of disclosure has been published or is otherwise in the public domain; (ii) which, after disclosure, becomes part of the public domain other than through a breach of this Agreement; (iii) which was known to the recipient prior to receipt from the Officer, provided such prior knowledge can be adequately substantiated; (iv) which becomes known to a recipient from a source which legally derives such information independently of the Officer under this Agreement; (v) which is freely disclosed by the Corporation or the Bank to a third party without an obligation of confidentiality or nondisclosure; or, (vi) which is disclosed pursuant to law, regulation or lawful order or process.

       **6.2**    **Return of Materials.** The Officer agrees to immediately deliver or return to the Corporation and the Bank upon termination of employment, upon expiration of this Agreement, or as soon thereafter as possible, all written information and any other similar items furnished by the Corporation and the Bank or prepared by the Officer in connection with the Officer's services hereunder and to immediately delete all electronically stored data of the Corporation and the Bank maintained on the Officer's personal computers or communication devices (i.e. laptop, tablet, cellular phone, etc.) and to return all employer-provided computers or communication devices.  The Officer will retain no copies thereof after termination of this Agreement or termination of the Officer's employment.

       **6.3**    **Creative Work.** The Officer agrees that all creative work and work product, including but not limited to all technology, business management tools, processes, software, patents, trademarks, and copyrights developed by the Officer during the term of this Agreement, regardless of when or where such work or work product was produced, constitutes work made for hire, all rights of which are owned by the Corporation and the Bank.  The Officer hereby assigns to the Corporation and the Bank all rights, title, and interest, whether by way of copyrights, trade secret, trademark, patent, or otherwise, in all such work or work product, regardless of whether the same is subject to protection by patent, trademark, or copyright laws.

       **6.4**    **Affiliates' Confidential Information is Covered.** For purposes of this Agreement, "Affiliate" of the Corporation or the Bank includes any entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the Corporation or the Bank.

       **6.5**    **Injunctive Relief.** The Officer acknowledges that it is impossible to measure in money the damages that will accrue to the Corporation and the Bank if the Officer fails to observe the obligations imposed by this Article 6.  Accordingly, if the Corporation or the Bank institutes an action to enforce the provisions hereof, the Officer hereby waives the claim or defense that an adequate remedy at law is available to the Corporation or the Bank, and the Officer agrees not to urge in any such action the claim or defense that an adequate remedy at law exists.  The confidentiality and remedies provisions of this Article 6 shall be in addition to and shall not be deemed to supersede or restrict, limit, or impair the

Corporation's or the Bank's rights under applicable state or federal statute or regulation dealing with or providing a remedy for the wrongful disclosure, misuse, or misappropriation of trade secrets or proprietary or Confidential Information.

**6.6**     **Confidentiality Obligation Survives Termination.** The rights and obligations set forth in this Article 6 shall survive termination of this Agreement.

### ARTICLE 7
### SOLICITATION AND COMPETITION AFTER EMPLOYMENT TERMINATION

**7.1**     **Covenant Not to Solicit Employees.** The Officer covenants and agrees not to, Directly or Indirectly, solicit or employ the services of any officer or employee of the Corporation or the Bank or an Affiliate (including an individual who was an officer or employee of the Corporation or the Bank or an Affiliate during the one (1)-year period following the Officer's termination) for two (2) years after the Officer's employment termination.

**7.2**     **Covenant Not to Compete.**

(a)     The Officer covenants and agrees not to Compete, Directly or Indirectly, with the Corporation or the Bank or an Affiliate for one (1) year after employment termination. For purposes of this Section 7.2:

(1)     the term "Compete" means:

(i)     providing Financial Products or Services on behalf of any Financial Institution for any Person residing in the Territory;

(ii)     assisting (other than through the performance of ministerial or clerical duties) any Financial Institution in providing Financial Products or Services to any Person residing in the Territory; or

(iii)     inducing or attempting to induce any Person who was a Customer of the Corporation or the Bank or an Affiliate at the date of the Officer's employment termination to seek Financial Products or Services from another Financial Institution.

(2)     the terms "Directly" and "Indirectly" mean:

(i)     acting as a consultant, officer, director, independent contractor, or employee of any Financial Institution in competition with the Corporation or the Bank or an Affiliate in the Territory; or

(ii)     communicating to such Financial Institution the names or addresses or any financial information concerning any Person who was a Customer of the Corporation or the Bank or an Affiliate when the Officer's employment terminated.

(3)     the term "Customer" means any Person to whom the Corporation or the Bank or an Affiliate is providing Financial Products or Services on the date of the Officer's employment termination or within one year thereafter.

(4)     the term "Financial Institution" means any bank, savings association, or bank or savings association holding company, or any other institution, the business of which is engaging in activities that are financial in nature or incidental to such financial activities as described in Section 4(k) of the Bank Holding Company Act of 1956, other than the Corporation or the Bank or an Affiliate.

(5)     the term "Financial Product or Service" means any product or service that a Financial Institution or a financial holding company could offer by engaging in any activity that is financial in nature or incidental to such a financial activity under Section 4(k) of the Bank Holding Company Act of 1956 and that is offered by the Corporation or the Bank or an Affiliate on the date of the Officer's employment termination, including but not limited to banking activities and activities that are closely related and a proper incident to banking.

(6)     the term "Person" means any individual or individuals, corporation, partnership, fiduciary or association.

(7)     the term "Territory" means the area within a twenty-five (25) mile radius of the Corporation's and the Bank's headquarters located at 702 North Shore Drive, Jeffersonville, Indiana (the "Headquarters") or any office of the Corporation or the Bank or an Affiliate in which the Bank operates a Retail Depository Branch as of the Effective Date and provided, however, that the term "Territory" shall not extend to any area outside the State of Indiana.  For purposes of this Agreement, "Retail Depository Branch" means any office location of the Bank in which consumer, personal and commercial depository services are offered and facilitated.

(b)     If any provision of this Section 7.2 or any word, phrase, clause, sentence or other portion thereof (including, without limitation, the geographical and temporal restrictions contained therein) is held to be unenforceable or invalid for any reason, the unenforceable or invalid provision or portion shall be modified or deleted so that the provisions hereof, as modified, are legal and enforceable to the fullest extent permitted under applicable law.

(c)     The Officer acknowledges that the Bank's willingness to enter into this Agreement and to make the payments contemplated by Articles 3 and 4 of this Agreement is conditioned on the Officer's acceptance of and adherence to the covenants set forth in Articles 6 and 7 of this Agreement and that the Bank would not have entered into this Agreement without such covenants in force.

**7.3     <u>Injunctive and Other Relief.</u>** Because of the unique character of the services to be rendered by the Officer hereunder, the Officer understands that the Corporation and the Bank would not have an adequate remedy at law for the material breach or threatened breach by the Officer of any one or more of the Officer's covenants in this Article 7.  Accordingly, the Officer agrees that the Corporation's and the Bank's remedies for a breach of this Article 7 include, but are not limited to, (i) forfeiture of any money representing accrued salary, bonuses, commissions and incentive compensation; contingent payments; or other fringe benefits (including any amount payable pursuant to Article 4) due and payable to the Officer during the period of any breach by Officer, (ii) a suit in equity by the Corporation or the Bank to enjoin the Officer from the breach or threatened breach of such covenants, and (iii) its attorney's fees and costs incurred to enforce the rights of the Corporation or the Bank under any article of this Agreement. The Officer hereby waives the claim or defense that an adequate remedy at law is available to the Corporation or the Bank and the Officer agrees not to urge in any such action the claim or defense that an adequate remedy at law exists. Nothing herein shall be construed to prohibit the Corporation or the Bank from pursuing any other or additional remedies for the breach or threatened breach.

**7.4** **Article 7 Survives Termination But Is Void Upon a Change in Control.** The rights and obligations set forth in this Article 7 shall survive termination of this Agreement.  However, Article 7 shall become null and void effective immediately upon a Change in Control if the Officer is employed by the Bank at the effective time of the Change in Control.

# ARTICLE 8
## MISCELLANEOUS

**8.1** **Successors and Assigns.**

(a) This Agreement shall be binding upon the Bank and any successors to the Bank, including any persons acquiring directly or indirectly all or substantially all of the business or assets of the Bank by purchase, merger, consolidation, reorganization, or otherwise, but this Agreement and the Bank's obligations under this Agreement are not otherwise assignable, transferable, or delegable by the Bank.  By agreement in form and substance satisfactory to the Officer, the Bank shall require any successor to all or substantially all of the business or assets of the Bank expressly to assume and agree to perform this Agreement in the same manner and to the same extent the Bank would be required to perform had no succession occurred.

(b) This Agreement shall inure to the benefit of and be enforceable by the Officer's personal or legal representatives, executors, administrators, successors, heirs, distributees, and legatees.

(c) Without written consent of the other parties, no party shall assign, transfer, or delegate this Agreement or any rights or obligations under this Agreement, except as expressly provided herein. Without limiting the generality or effect of the foregoing, the Officer's right to receive payments hereunder is not assignable or transferable, whether by pledge, creation of a security interest, or otherwise, except for a transfer by the Officer's will or by the laws of descent and distribution. If the Officer attempts an assignment or transfer that is contrary to this Section 8.1, the Bank shall have no liability to pay any amount to the assignee or transferee.

**8.2** **Governing Law, Jurisdiction and Forum.** This Agreement shall be construed under and governed by the internal laws of the State of Indiana, without giving effect to any conflict of laws provision or rule that would cause the application of the laws of any jurisdiction other than Indiana.  By entering into this Agreement, the Officer acknowledges that the Officer is subject to the jurisdiction of both the federal and state courts in Indiana.

**8.3** **Entire Agreement.** This Agreement sets forth the entire agreement of the parties concerning the employment of the Officer by the Bank.  Any oral or written statements, representations, agreements, or understandings made or entered into prior to or contemporaneously with the execution of this Agreement are hereby rescinded, revoked, and rendered null and void by the parties.

**8.4** **Notices.** All notices, requests, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand or mailed, certified or registered mail, return receipt requested, with postage prepaid.  Unless otherwise changed by notice, notice shall be properly addressed to the Officer if addressed to the address of the Officer on the books and records of the Bank at the time of the delivery of such notice, and properly addressed to the Bank if addressed to the Board at the Headquarters.

**8.5**     **Severability.** If there is a conflict between any provision of this Agreement and any statute, regulation, or judicial precedent, the latter shall prevail, but the affected provisions of this Agreement shall be curtailed and limited solely to the extent necessary to bring them within the requirements of law.  If any provisions of this Agreement is held by a court of competent jurisdiction to be indefinite, invalid, void or voidable, or otherwise unenforceable, the remainder of this Agreement shall continue in full force and effect unless that would clearly be contrary to the intentions of the parties or would result in an injustice.

**8.6**     **Captions and Counterparts.** The captions in this Agreement are solely for convenience. The captions do not define, limit, or describe the scope or intent of this Agreement.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original but all of which together shall constitute one and the same instrument.

**8.7**     **No Duty to Mitigate.**  The Officer shall not be required to mitigate the amount of any payment provided for in this Agreement by seeking other employment. Moreover, provided the Officer is not in breach of any obligation under Articles 6 and 7 this Agreement, the amount of any payment provided for in this Agreement shall not be reduced by any compensation earned or benefits provided as the result of employment of the Officer or as a result of the Officer being self-employed after employment termination.

**8.8**     **Amendment and Waiver.** This Agreement may not be amended, released, discharged, abandoned, changed, or modified in any manner, except by an instrument in writing signed by each of the parties hereto.  The failure of any party hereto to enforce at any time any of the provisions of this Agreement shall not be construed to be a waiver of any such provision, nor affect the validity of this Agreement or any part thereof or the right of any party thereafter to enforce each and every such provision.  No waiver or any breach of this Agreement shall be held to be a waiver of any other or subsequent breach.

**8.9**     **Compliance with Internal Revenue Code Section 409A.**

(a)     The Bank and the Officer intend that their exercise of authority or discretion under this Agreement shall comply with Section 409A of the Code.  If any provision of this Agreement does not satisfy the requirements of Section 409A of the Code, such provision shall nevertheless be applied in a manner consistent with those requirements.  If any provision of this Agreement would subject the Officer to additional tax or interest under Section 409A of the Code, the Bank shall reform the provision. However, the Bank shall maintain to the maximum extent practicable the original intent of the applicable provision without subjecting the Officer to additional tax or interest, and the Bank shall not be required to incur any additional compensation expense as a result of the reformed provision.

(b)     This Agreement is intended to comply with the requirements of Section 409A of the Code, and specifically, where applicable, with the "short-term deferral exception" under Treasury Regulation Section 1.409A-1(b)(4) and the "separation pay exception" under Treasury Regulation 1.409A-1(b)(9)(iii), and shall in all respects be administered in accordance with Section 409A of the Code. If any payment or benefit hereunder cannot be provided or made at the time specified herein without incurring sanctions on the Officer under Section 409A of the Code, then such payment or benefit shall be provided in full at the earliest time thereafter when such sanctions will not be imposed. For purposes of Section 409A of the Code, all payments to be made upon a termination of employment under this Agreement may only be made upon a "separation from service" (within the meaning of such term under Section 409A of the Code), each payment made under this Agreement shall be treated as a separate payment, the right to a series of installment payments under this Agreement (if any) is to be treated as a right to a series of separate payments, and if a payment is not made by the designated payment date under

this Agreement, the payment shall be made by December 31 of the calendar year in which the designated date occurs. To the extent that any payment provided for hereunder would be subject to additional tax under Section 409A of the Code, or would cause the administration of this Agreement to fail to satisfy the requirements of Section 409A of the Code, such provision shall be deemed null and void to the extent permitted by applicable law, and any such amount shall be payable in accordance with Section 8.9(c). In no event shall the Officer, directly or indirectly, designate the calendar year of payment.

(c)     Notwithstanding anything herein to the contrary, if the Officer is a "specified employee" (within the meaning of Section 409A of the Code) and it is necessary to postpone the commencement of any payments or benefits otherwise payable under this Agreement as a result of the Officer's separation from service with the Bank to prevent any accelerated or additional tax under Section 409A of the Code, then the Bank will postpone the commencement of the payment of any such payments or benefits hereunder (without any reduction in such payments or benefits ultimately paid or provided to the Officer) that are not otherwise paid with the "short-term deferral exception" under Treasury Regulations Section 1.409A-1(b)(4) and the "separation pay exception" under Treasury Regulations Section 1.409A-1(b)(9)(iii), until the first payroll date that occurs after the date that is six (6) months following the Officer's separation of service with the Bank. If any payments are postponed due to such requirements, such postponed amounts will be paid to the Officer in a lump sum on the first payroll date that occurs after the date that is six (6) months following the Officer's separation of service with the Bank. If the Officer dies during the postponement period prior to the payment of postponed amount, the amounts withheld on account of Section 409(A) of the Code shall be paid to the personal representative of the Officer's estate within sixty (60) days after the date of the Officer's death.

**8.10** **Required Provisions.**  In the event any of the foregoing provisions of this Agreement conflict with the terms of this Section 8.10, this Section 8.10 shall prevail.

(a)     All obligations under this Agreement shall be terminated, except to the extent a determination is made that continuation of the contract is necessary for the continued operation of the Bank (i) by the Comptroller of the Currency, or designee (the "Comptroller"), at the time the Federal Deposit Insurance Corporation enters into an agreement to provide assistance to or on behalf of the Bank under the authority contained in Section 13(c) of the FDIA; or (ii) by the Comptroller, at the time the Comptroller approves a supervisory merger to resolve problems related to operation of the Bank or when the Bank is determined by the Comptroller to be in an unsafe and unsound condition.  Any rights of the Officer that have already vested, however, shall not be affected by such action.

(b)     Any payments made to the Officer pursuant to this Agreement, or otherwise, are subject to, and conditioned upon, their compliance with 12 U.S.C. Section 1828(k) and FDIC Regulation 12 C.F.R. Part 359, Golden Parachute and Indemnification Payments.

**[signature page follows]**

**IN WITNESS WHEREOF,** the parties have executed this Employment Agreement as of the date first written above.

**FIRST SAVINGS BANK**

_____

Chairman of the Board of Directors

**OFFICER**

_____

Brian A. Simon

# Exhibit "F"

1/17/23

Brian Simon
407 Valley Glen Drive
Bryn Mawr, PA  19010

Dear Brian:

As you know, First Savings Bank has been in the process of reducing its workforce as a result of sustained financial losses within the Mortgage Banking division. Due to decreased loan production, loss of employees, and for financial and other economic reasons, the decision has been made to eliminate your position, effective 1/17/2023. You shall be provided the enclosed separation package that is consistent with Bank practices.

To assist you with your transition to new employment, and in exchange for signing and returning this agreement, you will receive separation pay of $10,769.23, which is equal to two weeks of base salary, subject to applicable payroll withholding and deductions. This separation payment will be in the form of a lump sum payment provided to you as soon as administratively possible after your final day of employment.

Regardless of whether this letter is signed and returned, you will receive final pay for work provided through separation date of 1/17/2023. Any earned but not yet paid commissions or bonus will be paid in accordance with the written pay plan defining the additional earnings, if any, and paid in accordance with the standard prescribed payment schedule. Unused accrued vacation and sick time will also be paid out to you as outlined in the employee handbook. Moreover, First Savings Bank will not contest any unemployment claim you may bring in connection with the ending of your employment.

As a reminder, documents, files, records, data and other information developed and acquired by First Savings Bank and its affiliates as to which you have had access constitute confidential information and/or "trade secrets" under applicable law and that under no circumstances or for any reason will you utilize such confidential business information, and such confidential business information shall remain the sole property of First Savings Bank and its affiliates.

**Release**. By signing below, you hereby release First Savings Bank and each of its affiliates, subsidiaries, representatives, officers, directors, employees, and/or agents you had dealings with ("Released Parties") from any and all actions, claims, demands, causes of action, complaints, damages, losses, expenses and liabilities of any name and nature, known or unknown, that you may now have or hereafter can, shall or may have for, arising out of or related to your employment relationship with First Savings Bank, the termination of such relationship, or the terms and conditions of such relationship. This release does not release any unemployment claims, age claims, or any claims that cannot be released. Otherwise, it is a complete release of all claims. You, of course, have the right to seek independent legal counsel to review this document and are advised to do so.

In order to receive the separation payment, please provide your handwritten signature below (electronic signatures are not valid) and return this letter in hard-copy or electronic scan to Julie Bleich, HRD, 702 North Shore Drive, Suite 300, Jeffersonville, IN  47130; fax to 812.670.3706; or email to jbleich@fsbbank.net on or before Friday, January 27, 2023. Additional inquiries can be made to Julie Bleich at (812) 218-6857.

Sincerely,

*Larry Myers*

Larry Myers
EVP, President & CEO


**I have read the above and agree to provide the release in exchange for the referenced separation payment:**

**EMPLOYEE SIGNATURE:**

**By: _____          Date: _____**